### UNITED STATES DISTRICT COURT FOR THE
### DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| **Commonwealth of Massachusetts, ex rel.** | § | |
| **Joseph Nocie,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **Steward Health Care Systems, LLC,** | § | |
| **Steward Medical Group, St. Elizabeth's** | § | |
| **Medical Center,** | § | |
| | § | |
| **Defendants.** | § | **FILED UNDER SEAL** |
| | § | |

## COMPLAINT

On behalf of the United States of America ("United States") and the Commonwealth of

Massachusetts, Plaintiff-Relator, Joseph Nocie ("Relator"), brings this action to recover for false

claims submitted to Government Health Care Programs, including Medicare and Medicaid, as a

result of the conduct of defendants, Steward Health Care Systems, LLC ("Steward"), Steward

Medical Group ("SMG") and St. Elizabeth's Medical Center ("St. Elizabeth's") (collectively

"Defendants"), in violation of the Federal False Claims Act ("Federal FCA"), 31 U.S.C. § 3729,

*et seq.*, and the Massachusetts Whistleblower Law: The False Claims Act ("Massachusetts

FCA"), Ch.12 § 5A, *et seq.* Relator brings this action to recover all damages, civil penalties and

all other recoveries provided for under the FCA and the Massachusetts FCA.

### I.    NATURE OF ACTION

1.    Beginning in 2012 and continuing through the present, Defendants have conducted

a scheme by which they entered into compensation arrangements through employment contracts

with certain physicians in violation of the Stark Act ("Stark"), 42 U.S.C. § 1395nn, and the Anti-

1

Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b). These employment contracts provide for compensation amounts that exceed fair market value, are not commercially reasonable, and/or take into account the volume or value of the referrals or other business generated between the physician and Defendants. These referrals were to Defendants for designated health services, such as inpatient and outpatient hospital services.

2.      Defendants knew that the physician compensation arrangements violated Stark and the AKS; nonetheless, Defendants entered into these arrangements in order to establish a profitable heart center for the region. Faced with many prestigious hospitals in the Boston area, Defendants attempted to develop a destination offering comprehensive heart services through improper employment arrangements with specific physicians. Further, Defendants knew that these physicians, who are all surgeons, represent a significant source of profits through reimbursements obtained from Government Health Care Programs.

3.      As a result, Defendants submitted and/or caused others to submit false and fraudulent claims for payment to Medicare and Medicaid, which included claims relating to designated health services, such as inpatient and outpatient services, rendered to patients who were referred by physicians who had improper employment agreements in violation of Stark and the AKS.

4.      Further, based on these violations, Defendants submitted and/or caused to be submitted claims and cost reports to the United States and the Commonwealth of Massachusetts that falsely certified that the services for which Defendants had received Medicare/Medicaid reimbursements had been provided in compliance with applicable laws and regulations in violation of the Federal and Massachusetts FCAs.

5.      As a result of Defendants' conduct alleged herein, the government has suffered approximately $42 million in single damages.

## II.    JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1367(a).

7.      This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants reside and transact business in the District of Massachusetts.

8.      Venue is proper in the District of Massachusetts under 31 U.S.C. § 3732 and 28 U.S.C. § 1391 (b) and (c) because Defendants reside and transact business in this District.

## III.   PARTIES

9.      The United States is a Plaintiff in this action on behalf of: 1) the Department of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS"), which administers the Medicare Program, 42 U.S.C. §§ 1395 *et seq.* (Medicare"), and the Medicaid Program, 42 U.S.C. §§ 1396 *et seq.* ("Medicaid").

10.     Plaintiff-Relator, Joseph Nocie, is a United States citizen and resident of Sacramento, CA.  Relator previously worked as the Chief Financial Officer of St. Elizabeth's Medical Center from May 2016 through November 2017.

11.     Defendant Steward Health Care Systems, LLC ("Steward"), since its acquisition of IASIS Healthcare LLC in 2017, now owns and operates hospitals and medical facilities across ten states, including 36 individual hospitals.  Prior to the acquisition, Steward owned 18 hospitals in Massachusetts, Pennsylvania, Ohio and Florida.  Now, Steward is the largest for-profit, private hospital operator in the United States with projected revenues of almost $8 billion in 2018.  Steward is owned by Cerebus Capital Management, a private equity firm, and is based in Boston,

3

Massachusetts (but plans to move their corporate headquarters to Dallas, TX in the Spring/Summer of 2018).

12. Defendant Steward Medical Group ("SMG"), an affiliate of Steward, is a physician-led, multi-specialty practice organization made up of over 1,000 physicians. SMG provides staffing services to Steward in exchange for payments from Steward for physician's salaries and benefits and administrative costs.

13. Defendant St. Elizabeth's Medical Center ("St. Elizabeth's") is located in Brighton, MA and is one of the hospitals owned by Defendant Steward.

## IV. THE FEDERAL FCA AND MASSACHUSETTS FCA

14. The Federal FCA provides, among other things, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B).

15. The relevant terms are defined as follows. The term "knowingly" means "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii). Proof of specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1)(B).

16. The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the

4

Government's behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded ...." 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

17.     "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

18.     Like the Federal FCA, the Massachusetts FCA provides for civil monetary penalties and treble damages. Further, the liability provisions of the Massachusetts FCA are materially identical to the provisions under the Federal FCA set forth above.

## V.     THE MEDICARE PROGRAM

19.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of healthcare services for certain individuals. HHS is responsible for the administration and supervision of the Medicare program, which it does through CMS, an agency of HHS.

20.     Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426A. Part A of the Medicare Program authorizes payment for institutional care, including hospital, skilled nursing facility and home health care. *See* 42 U.S.C. § 1395c-1395i-4. Part B primarily covers physician and other ancillary services. *See* 42 U.S.C. § 1395k.

21.     To assist in the administration of Medicare Parts A and B, CMS contracts with Medicare Administrative Contractors ("MACs"). The MACs generally act on behalf of CMS to process and pay Part A and Part B claims and perform administrative functions on a regional level. *See* 42 C.F.R. § 421.5. In Massachusetts, the MAC is National Government Services, Inc.

5

22.     Providers who wish to be eligible to participate in Medicare Part A must periodically sign an application to participate in the program. The application, which must be signed by an authorized representative of the provider, contains a certification statement that states "I agree to abide by the Medicare laws, regulations and programs instructions that apply to this provider.... I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare." *See* CMS-855A, § 15(A)(3), *available at* https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms855a.pdf

23.     Under the Medicare program, CMS makes payments retrospectively (after the services are rendered) to hospitals for inpatient and outpatient services.

24.     Upon discharge of Medicare beneficiaries from a hospital, the hospital submits Medicare Part A claims for interim reimbursement for inpatient and outpatient items and services delivered to those beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64. Hospitals submit patient-specific claims for interim payments on a Form UB-04.

25.     As detailed below, Defendants St. Elizabeth's and Steward submitted or caused to be submitted claims both for specific inpatient and outpatient services provided to individual beneficiaries and claims for general and administrative costs incurred in treating Medicare beneficiaries.

26.     As a prerequisite to payment under Medicare Part A, CMS requires hospitals to submit annually a form CMS-2552-10, more commonly known as the hospital cost report. Cost reports are the final claim that a provider submits to the fiscal intermediary or MAC for items and services rendered to Medicare beneficiaries.

6

27.     After the end of each hospital's fiscal year, the hospital files its hospital cost report with the fiscal intermediary or MAC, stating the amount of Part A reimbursement the provider believes it is due for the year. *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20. *See also* 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

28.     During the relevant time period, Medicare Part A payments for hospital services were determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-04s) during the course of the fiscal year. On the hospital cost report, this Medicare liability for services is then totaled with any other Medicare Part A liabilities to the provider. This total determines Medicare's true liability for services rendered to Medicare Part A beneficiaries during the course of a fiscal year. From this sum, the payments made to the provider during the year are subtracted to determine the amount due the Medicare Part A program or the amount due the provider.

29.     Under the rules applicable at all times relevant to this complaint, Medicare, through its fiscal intermediaries and MACs, had the right to audit the hospital cost reports and financial representations made by the hospital to ensure their accuracy and preserve the integrity of the Medicare Trust Funds. This right includes the right to make retroactive adjustments to hospital cost reports previously submitted by a provider if any overpayments have been made. *See* 42 C.F.R. § 413.64(f).

30.     Every hospital cost report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

31.     For all relevant years, the responsible provider official was required to certify, and did certify, in pertinent part:

> to the best of my knowledge and belief, it [the hospital cost report] is a true, correct and complete statement prepared from the books and records of the

7

> provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the law and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

32. For the entire period at issue, the hospital cost report certification page also

included the following notice:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or were otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

Form CMS 2552-10, Part II, *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R3P240f.pdf.

33. Thus, the provider was required to certify that the filed hospital cost report is

(1) truthful, *i.e.,* that the cost information contained in the report is true and accurate; (2) correct,

*i.e.,* that the provider is entitled to reimbursement for the reported costs in accordance with

applicable instructions; (3) complete, *i.e.,* that the hospital cost report is based upon all

information known to the provider; and (4) that the services provided in the cost report were

billed in compliance with applicable laws and regulations, including the Stark Statute (described

below).

34. For each of the years at issue, Steward, on behalf of St. Elizabeth's, submitted cost

reports to the MAC attesting, among other things, to the certification quoted above.

35. A hospital is required to disclose all known errors and omissions in its claims

for Medicare Part A reimbursement (including its cost reports to its MAC).

36. In addition to Part A claims, doctors or other providers submit Medicare Part B

claims to the MAC for payment.

37. Under Part B, Medicare will generally pay 80 percent of the "reasonable"

8

charge for medically necessary items and services provided to beneficiaries. *See* 42 U.S.C. §§ 1395l(a)(1), 1395y(a)(1). For most services, the reasonable charge has been defined as the lowest of (a) the actual billed charges, (b) the provider's customary charge, or (c) the prevailing charge for the service in the locality. *See* 42 C.F.R. §§ 405.502–504.

## VI.    THE MEDICAID PROGRAM

38.    Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the indigent and disabled. The federal involvement in Medicaid is largely limited to providing matching funds and ensuring that states comply with minimum standards in the administration of the program.

39.    The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation (FFP). 42 U.S.C. §§ 1396 *et seq.*

40.    In order to qualify for FFP, each state's Medicaid program must meet certain minimum requirements, including the provision of hospital services to Medicaid beneficiaries. 42 U.S.C. § 1396a(a)(10)(A), 42 U.S.C. § 1396d(a)(1) – (2).

41.    In Massachusetts, the Medicaid program is called "MassHealth." Providers participating in MassHealth, such as Defendant St. Elizabeth's, submit claims for hospital services rendered to Medicaid beneficiaries to MassHealth for payment.

## VII.    THE STARK STATUTE

42.    Enacted as amendments to the Social Security Act, 42 U.S.C. § 1395nn (commonly known as the "Stark Statute" or "Stark") prohibits physicians (or other entity providing designated services) from submitting Medicare claims for designated health services (as defined in 42 U.S.C. § 1395nn(h)(6)) based on patient referral from physicians having a

9

"financial relationship" (as defined in the statute) with the hospital, and prohibits Medicare from paying any such claims.

43.    The Stark Statute establishes the clear rule that the United States will not pay for designated health services prescribed by physicians who have improper financial relationships with other providers. The statute was designed specifically to prevent losses that might be suffered by the Medicare program due to questionable utilization of designated health services.

44.    The Stark Statute explicitly states that Medicare may not pay for any designated health services provided in violation of the Stark Statute. *See* 42 U.S.C. § 1395nn(g)(l).  In addition, the regulations implementing the Stark Statute expressly require that any entity that collects payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis."  42 C.F.R. § 411.353(d) (2006).

45.    Congress enacted the Stark Statute in two parts, commonly known as Stark I and Stark II. Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992, by physicians with a prohibited financial relationship with the clinical lab provider unless a statutory or regulatory exceptions applies. *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

46.    In 1993, Congress passed Stark II, which extended the Stark Statute to referrals for ten additional designated health services. *See* Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152. Stark II applies herein.

10

47.     In brief, the Stark Statute prohibits a hospital from submitting a claim to Medicare

for "designated health services" that were referred to the hospital by a physician with whom the

hospital has "financial relationship," unless a statutory exception applies.

48.     In pertinent part, the Stark Statute provides:

(a)     Prohibition of certain referrals

(1)     In general
Except as provided in subsection (b) of this section, if a
physician…has a financial relationship with an entity
specified in paragraph, (2), then –

(A)     the physician may not make a referral to the entity
for the furnishing of designated health services for
which payment otherwise may be made under this
subchapter, and

(B)     the entity may not present or cause to be presented
a claim under this subchapter or bill to any
individual, third party payor, or other entity for
designated health services furnished pursuant to a
referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn(a)(1).

49.     Moreover, the Stark Statute specifically states that Medicare will not pay for

designated health services billed by a hospital when the designated health services resulted from a

prohibited referral under subsection (a). *See* 42 U.S.C. § 1395nn(g)(1).

50.     The Stark Statute defines "financial relationship" to include a "compensation

arrangement," which means any arrangement involving any remuneration paid directly or indirectly

to referring physician. *See* 42 U.S.C. §§ 1395nn(h)(1)(A), (h)(1)(B).

51.     "Designated health services" are defined to include inpatient and outpatient

hospital services. *See* 42 U.S.C. § 1395nn(h)(6)(K).

52.     The Stark Statute and companion regulations contain exceptions for certain

11

compensation arrangements. These exceptions include, among others, "bona fide employment relationships," "personal services arrangements," "fair market value arrangements," and "indirect compensation relationships."

53.    In order to qualify for the Stark Statute's exception for bona fide employment relationships, compensation arrangements must meet, *inter alia*, the following statutory requirements: (A) the amount of the remuneration is fair market value and not based on the value or volume of referrals, and (B) the remuneration would be commercially reasonable even in the absence of referrals from the physician to the hospital. *See* 42 U.S.C. §§ 1395nn(e)(2)(B) and (e)(2)(C).

54.    In order to qualify for the Stark Statute's exception for personal services arrangements, a compensation arrangement must meet, *inter alia*, the following statutory requirements: (A) the compensation does not exceed fair market value and (B) is not determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties (unless it falls within a further "physician incentive plan" exceptions as described in the statute). *See* 42 U.S.C. § 1395nn(e)(3)(A)(v).

55.    A "physician incentive plan" under § 1395nn(e)(3) is defined very narrowly, and only applies to compensation arrangements that "may directly or indirectly have the effect of reducing or limiting services provided with respect to individuals enrolled with the entity." 42 U.S.C. § 1395nn(e)(3)(B)(ii).

56.    In order to qualify for the Stark Statute's exception for fair market value compensation, there must be an agreement in writing, the agreement must set forth all services to be furnished, all compensation must be set in advance and consistent with fair market value, the agreement must not take into consideration the volume or value of referrals or other business

12

generated by the referring physician, and the agreement must not violate federal or state law. *See* 42 C.F.R. § 411.357(l).

57.     In order to qualify for the Stark Statute's exception for indirect compensation arrangements, defined as any instance where compensation flows from the entity providing designated health services through an intervening entity and then to the referral source (*see* 42 C.F.R. § 411.354(c)(2)), there must be a written agreement, the compensation must be consistent with fair market value, the compensation may not take into consideration the volume or value of referrals or other business generated by the referring physician, and the agreement cannot violate the Anti-Kickback Statute. *See* 42 C.F.R. § 411.357(p).

58.     Based on the facts alleged herein, none of the statutory or regulatory exceptions to the Stark Statute apply.

59.     The Stark Statute also applies to claims for payment under Medicaid, and federal funds may not be used to pay for designated health services through a state Medicaid Program. *See* 42 U.S.C. § 1396b(s).

## VIII.  THE ANTI-KICKBACK STATUTE

60.     As alleged herein, Defendants' excessive compensation to the specified physicians amount to kickbacks in violation of the "Anti-Kickback" Statute ("AKS"), 42 U.S.C. § 1320a-7b(b)(2)(B).  The AKS prohibits the payment of any remuneration to any person in order to induce that person to "purchase, lease, order, arrange for or recommend purchasing, leasing or ordering any good, facility, service or item" for which reimbursement may be made under a Federal health program. *See* 42 U.S.C. § 1320a-7b(b)(2)(B).

13

61. Specific intent is not required to establish a violation of the AKS. That is, "a person need not have actual knowledge of [the AKS] or specific intent to commit a violation of [the AKS]." 42 U.S.C. § 1320(a)-7b(h).

62. "Federal health care program" is defined at 42 U.S.C. § 1320a-7b(f) as any plan or program providing health benefits funded, whether directly or indirectly, by the United States Government. The AKS applies to claims for designated health services based on referrals from the specified physicians submitted by Defendants to the Government Health Care Programs, including Medicare and Medicaid.

63. Any violation of the AKS in connection with a claim for payment from a Government Health Care Program is a false claim under the federal False Claims Act. 42 U.S.C. § 1320(a)-7(b)(g).

## IX. DEFENDANTS' EXCESSIVE COMPENSATION ARRANGEMENTS WITH THE SPECIFIED PHYSICIANS VIOLATED STARK AND THE ANTI-KICKBACK STATUTE

64. As alleged herein, Defendants entered into employment contracts with certain physicians that provided for excessive compensation arrangements. In general, the employment contracts pay the physicians a base salary plus a bonus payment(s) in exchange for the physicians agreeing to see patients and performing surgical procedures at St. Elizabeth's or another Steward hospital.

65. Typically, when a physician sees a Medicare or Medicaid patient for an office visit, surgical procedural or other medical care, the physician bills for his or her professional services and directly receives the reimbursement for those services. The hospital at which the surgery or other care is performed is also able to bill, and receive reimbursement for, the use of its facilities associated with those professional services (often referred to as "technical/facility reimbursement").

14

The technical/facility reimbursement is intended to compensate the hospital for the use of its operating rooms, diagnostic equipment and medical supplies. Thus, while a patient represents a certain amount of professional services income for the physician, that patient also represents significant revenue to the hospital through technical/facility reimbursement. In other words, for every surgical procedure or other medical care provided to a Medicare or Medicaid patient, the hospital is able to receive reimbursement for the technical/facility fee associated with the surgery, inpatient stay, outpatient visit or other care.

66.     In violation of Stark and the AKS, Defendants entered into employment contracts with physicians, paying them substantial and excessive compensation to induce the physicians to refer "designated health services." As defined under Stark, "designated health services" include inpatient and outpatient hospital services for which Defendants could receive technical/facility reimbursements. In other words, Defendants paid the physicians compensation – that was in excess of fair market value, not commercially reasonable and improperly took into account the volume or value of referrals – to induce the physicians to refer inpatient and outpatient hospital services to Defendants Steward and St. Elizabeth's. Reimbursements for inpatient and outpatient hospital services represent a significant source of revenue for Defendants.

67.     Further, in determining the amount of compensation to pay to physicians, Defendants took into account the value and volume of referrals each physician would make or made in the form of technical/facility reimbursement for inpatient and outpatient hospital services. Prior to entering into contracts with physicians, Defendants routinely calculated how much Defendants would earn by hiring a particular physician.

## A.     Defendants Paid Dr. Agnihotri Excessive Compensation to Generate Referrals in Violation of Stark and the AKS

### 1.     Physician Employment Agreement with Dr. Agnihotri

15

68.     Dr. Agnihotri is the Chief of the Division of Cardiac Surgery at Defendant St. Elizabeth's. He performs such surgeries as cardiac surgery, minimally invasive aortic valve replacement and minimally invasive bypass surgery.

69.     In 2012, Defendant SMG, the physician group affiliated with Defendant Steward, hired Dr. Agnihotri and agreed to pay him excessive compensation, above fair market value and for an amount that would not be considered commercially reasonable in order to induce his referrals of inpatient and outpatient services to Defendants Steward and St. Elizabeth's.

70.     Specifically, pursuant to the employment agreement, effective August 31, 2012, Defendant SMG hired Dr. Agnihotri, a cardiac surgeon, to work at St. Elizabeth's and serve as the Chief of Cardiac Surgery. Exhibit A, pgs. 14-15, 25; *see also* Exhibit B. Under the physician employment agreement, Dr. Agnihotri was immediately paid a $1 million signing bonus. Ex. A at 17. Further, the agreement provides for an annual base salary of $750,000 and incentive bonus from $250,000 up to $600,000. *Id.* at 14, 19-23.

71.     To receive his base salary of $750,000, the agreement provides for Dr. Agnihotri to spend 80% of his time on clinical services (*i.e.,* base clinical compensation of $600,000) and 20%, or at least 8 hours per week, on administrative duties (*i.e.,* administrative compensation of $150,000). Ex. A, pgs 14-18, 25-27. The agreement provides for a long a list of required administrative and management duties, including, *inter alia*, "[p]articipation in administration of the division and cooperating with the nursing service, physician practice plan and hospital administration of matters that affect patient care and operational performance . . . ." *Id.* at 25. In addition, Dr. Agnihotri is required to track his time working on administrative tasks for the days on which these tasks were performed, and submit an Administrative Services Time Record to SMG, no later than ten days after the end of the month. *Id.* at 27.

16

72.     In addition to his base compensation, Dr. Agnihotri also receives an incentive
bonus of $250,000 to $600,000 depending on the number of cardiovascular surgeries performed by
the Division of Cardiac Surgery. Ex. A, pgs. 19-23. The Division of Cardiac Surgery at St.
Elizabeth's is composed of three physicians: Drs. Agnihotri (the Chief of the Division), Ketchedjian
and Tam. Thus, if the surgeons in the Division perform at least 400 surgical cardiac procedures
throughout the year, Dr. Agnihotri is paid a bonus of $250,000. For each additional surgery
performed, he is paid an increasing bonus up to $600,000 for 600 surgeries. (His average
performance has been around 700 surgeries for a total bonus of $700,000).

73.     In addition, under the agreement, Dr. Agnihotri receives fringe benefits (*e.g.*,
health, dental, life insurance), CME reimbursement and related travel expenses, and medical
malpractice insurance. Ex. A, pgs. 15-16.

74.     The agreement is for an initial term of five (5) years. Ex. A, pg. 14.

75.     In 2014, Dr. Agnihotri's employment agreement was amended to provide for an
increased potential incentive bonus of $800,000 if the Division of Cardiac Surgery performed 800
procedures in a year. Exhibit C.

76.     In exchange for the compensation set forth in the employment agreement, Dr.
Agnihotri agrees to provide medical services to patients at St. Elizabeth's and assign the right to bill
for his professional services to SMG. Ex. A, pgs 1, 8. Further, Dr. Agnihotri agrees, except under
certain limited circumstances, to refer all patient for all inpatient and outpatient services within
Steward "or to an entity with which Steward has an established clinical referral relationship[.]" *Id.*
at 9.

### 2.     Dr. Agnihotri's Compensation is in Excess of Fair Market Value and Not Commercially Reasonable

17

77. For 2012 to the present, Defendants have paid Dr. Agnihotri excessive

compensation in order to retain his services and ensure his substantial referral stream. As explained

above, every time Dr. Agnihotri performs a surgical procedure (or sees a patient on an inpatient or

outpatient basis), Defendants St. Elizabeth's and Steward are able to bill and obtain reimbursement

for the associated technical/facility fees. These technical/facility fees constitute prohibited referrals

under Stark and are in violation of the AKS.

78. Based primarily on the generous bonus payments paid to Dr. Agnihotri, his total

compensation has consistently exceeded fair market value and been commercially unreasonable:

| Year | Number of Cardiac Procedures | Bonus | Total Compensation* |
|------|------------------------------|-------|---------------------|
|      |                              |       |                     |
| 2013 | 524 | $486,000 | $1.23 million |
| 2014 | 537 | $505,500 | $1.25 million |
| 2015 | 620 | $620,000 | $1.37 million |
| 2016 | 716 | $716,000 | $1.46 million |
|      |                              |       |                     |

**\*Note:** These amounts do not include the $1 million signing bonus
paid to Dr. Agnihotri and would be greater if the bonus were included.

79. From 2012 through 2017, his total compensation has exceeded the 90th percentile

of the MGMA[1].

---

[1] MGMA (the Medical Group Management Association) produces annual Physician Compensation and Production Survey Reports based on data from tens of thousands of providers which spotlight the relationship between compensation and productivity for physicians. The annual survey is a benchmark widely used in the health care industry to set physician compensation.

18

80. For example, for 2016, Dr. Agnihotri's total compensation exceeded $1.4 million (again, this amount does not include the $1 million signing bonus) and was above the 90 percentile of physician compensation on the MGMA. However, his productivity did not support his compensation. His work $RVUs^2$ range between 60%-70% while his compensation is 1.4 times the 90% of the MGMA table.

81. Further, the compensation paid to Dr. Agnihotri vastly exceeded the value of collections obtained by Defendant SMG for his professional services. For example, in 2016, SMG collected approximately $742,000 in payments for Dr. Agnihotri's medical services. So although for his professional services SMG only earned about $742,000, Dr. Agnihotri was paid over $1.4 million. In other words, he was paid roughly 193% more than his collections.

82. Although Dr. Agnihotri's total compensation far exceeded the amount of money Defendants received from payers for his medical services and his work RVUs did not justify his high compensation, Defendants accepted these losses and effectively subsidized his practice. Defendants did this because Dr. Agnihotri referred nearly all of his patients to Steward's operating rooms, where Defendants profited handsomely by billing for the technical/facility reimbursement associated with the patients' surgeries and other medical care. These referrals eliminated the projected losses Defendants took on Dr. Agnihotri's practice.

83. This financial arrangement through Dr. Agnihotri's employment contract that operated at a loss and was only profitable if the technical/facility reimbursement was considered, was essentially an inducement paid to him for referrals of inpatient and outpatient hospital services.

84. Throughout the relevant period, Dr. Agnihotri referred patients to Steward hospitals for surgical procedures and other medical care.

---

2     Work RVUs (also referred to as "wRVUs" stand for work relative value units, a measure of the level of time, still training and intensity to provide a particular medical service.

19

85.     Since October of 2012, Dr. Agnihotri has performed cardiac surgeries on

approximately 541 Medicare patients.  For these procedures, Defendants St. Elizabeth's and Steward

have been able to bill and obtain reimbursement for the technical/facility fees connected with these

541 surgical procedures.  As a result, Defendants St. Elizabeth's and Steward have realized

reimbursement payments of over \$34 million attributable to Dr. Agnihotri's procedures alone.

86.     For example, for 2016, St. Elizabeth's and Steward obtained over \$17 million in

technical/facility reimbursement for inpatient and outpatient encounters for patients seen by Dr.

Agnihotri.  Of that \$17 million, over \$8.2 million was attributable to Medicare and Medicaid

patients.

| Hospital's Reimbursement (Technical/Facility) For 2016 | Subtotal- Hospital Reimbursement attributable to Medicare/Medicaid |
|---|---|
|  |  |
| \$17,005,864 IP | \$8,226,576 IP |
| \$83,531 OP | \$22,523 OP |
| \$17,089,395 Total | \$8,249,099 Total |
|  |  |

87.     Despite paying Dr. Agnihotri more than the amount collected in professional

services reimbursements, Defendants still made a substantial amount of money in technical/facility

reimbursements for inpatient and outpatient services referred by Dr. Agnihotri.

88.     Given that Dr. Agnihotri was paid total compensation that exceeded the collections

received for his professional services, Defendants could not reasonably have concluded that the

compensation arrangement in his contract was fair market value for his service or was commercially

reasonable.

20

89. Furthermore, given that his compensation was not justified by the amount of work he was doing (*i.e.,* his wRVUs), Defendants could not reasonably have concluded that the compensation arrangement in his contract was fair market value for his service or was commercially reasonable.

90. Lastly, given that his compensation took into account the volume or value of referrals or other business generated through referrals, Defendants could not reasonably have concluded that the employment agreement did not violate the Stark Statute and the AKS.

91. Based on the contractual and financial relationship between Dr. Agnihotri and Defendants, none of the statutory or regulatory exceptions to the Stark Statute apply.

92. His total physician compensation exceeds fair market value. Further, it would not be considered commercially reasonable as his credentials and reputation do not arguably justify an outsized employment compensation agreement. Dr. Agnihotri was hired in 2012 by his personal friend, the President of Steward, Ralph De La Torre. Further, Dr. Agnihotri does not have any extraordinary research, publishing, teaching or speaking experience that would possibly support his excessive compensation.

93. In addition to the reasons stated above, Dr. Agnihotri did not perform the administrative duties required under the contract. As discussed above, Dr. Agnihotri is paid $150,000 a year to perform at least eight hours per week of administrative and management duties. While Dr. Agnihotri was on a number of different committees as part of these duties, such as the Quality Control Committee and the Medical Executive Committee, he did not regularly, if ever, attend these committee meetings or participate in any meaningful way. It is Relator's belief that Dr. Agnihotri's performance of his administrative duties fell woefully short of what was required under his contract.

21

94.     In addition to failing to fulfill his administrative duties, he did not follow the time-keeping requirements. While required under his employment agreement to keep track of his time performing his administrative duties and submit a time record, Dr. Agnihotri did not meet these documentation requirements. Prior to November 2017, Relator believes that there were no signed time cards on file (for Dr. Agnihotri and most all of the other physicians as well). Instead, the payroll system just automatically added the required administrative hours without a time card or any record of how much time the physician had devoted to the administrative tasks. Defendant SMG performed a compliance audit of time cards in November 2017 which revealed the failure of most all of the employed physicians with administrative duties to have submitted the requisite time records.

## B.     The Employment Contract with Dr. Pomposelli

95.     From October 1, 2011 to the present, Defendants have paid Dr. Pomposelli excessive compensation in order to retain his services and ensure his substantial referral stream. Exhibits D and E. Dr. Pomposelli is a vascular surgeon at St. Elizabeth's who performs such procedures as lower extremity bypasses, carotid stenting and endovascular aneurysm repair.

96.     As explained above, every time Dr. Pomposelli performs a surgical procedure (or sees a patient on an inpatient or outpatient basis), Defendants are able to bill for these services and obtain reimbursement for, the associated technical/facility fees. These claims for reimbursement constitute prohibited referrals under Stark and are in violation of the AKS.

97.     His total compensation has consistently exceeded fair market value and been commercially unreasonable.

98.     That is, his total compensation has consistently exceeded the 90th percentile of the MGMA.

99.     For example, for 2016, Dr. Pomposelli received over $777,000 in total compensation and for 2017, $1 million, both of which were above the 90th percentile of physician

22

compensation on the MGMA table. However, his work productivity did not support his compensation. Even though Dr. Pomposelli possibly devoted up to 30% of his time to administrative duties and arguably performed those duties, his inflated compensation was still not justified. For example, for 2016, his work RVUs were less than 20% of the MGMA, while his compensation was at the 90%, as represented in the following chart:

| Physician | Department | Total Comp for 2016 and 2017 | Compensation compared to MGMA | wRVUs compared to MGMA |
|---|---|---|---|---|
| | | | | |
| Pomposelli | Vascular Surgery | $777,032 | >90% | <20% |
| | | $1,000,000 | >90% | <20% |
| | | | | |

100. Further, the compensation paid to Dr. Pomposelli vastly exceeded the value of collections obtained by SMG for his professional services. For example, in 2016, SMG collected approximately $300,000 in payments for Dr. Pomposelli's medical services. So although for his professional services SMG only earned about $300,000, Dr. Pomposelli was paid over $777,000 and then $1 million the following year. In other words, he was paid about 256% more than his collections.

101. Although Dr. Pomposelli's total compensation far exceeded the amount of money Defendants received from payers for his medical services and his work RVUs did not justify his high compensation, Defendants accepted these losses and effectively subsidized his practice. Defendants did this because Dr. Pomposelli referred nearly all of his patients to Steward's operating rooms, where Defendants profited handsomely by billing for these inpatient and outpatient services and

23

receiving the technical/facility reimbursement associated with the patients' surgeries. These referrals eliminated the projected losses Defendants took on Dr. Pomposelli's practice.

102.     This financial arrangement through Dr. Pomposelli's employment contract, which operated at a loss and was only profitable if the technical/facility reimbursements were considered, was essentially an inducement paid to him for referrals of inpatient and outpatient services.

103.     Throughout the relevant period, Dr. Pomposelli referred patients to Steward hospitals for inpatient and outpatient medical care, including surgical procedures.

104.     Since October 2011, Dr. Pomposelli has performed vascular surgeries on numerous Medicare patients. For these procedures, Defendants St. Elizabeth's and Steward have been able to bill and obtain reimbursement for the technical/facility fees connected with these surgical procedures. For example, for 2016, St. Elizabeth's and Steward obtained over \$4.5 million in technical/facility reimbursement for inpatient and outpatient encounters for patients seen by Dr. Pomposelli. Of that amount, over \$2.5 million was attributable to Medicare and Medicaid patients.

## C.     The Employment Contract with Dr. Kansal

105.     From February 28, 2013 to the present, Defendants have paid Dr. Kansal excessive compensation in order to retain his services and ensure his substantial referral stream. Exhibits F and G. Dr. Kansal is a vascular surgeon at St. Elizabeth's who performs such procedures as aortic aneurysm repair and carotid stenting to treat carotid artery disease.

106.     Every time Dr. Kansal performs a surgical procedure (or sees a patient on an inpatient or outpatient basis), Defendants are able to bill, and obtain reimbursement for, the associated technical/facility fees. These claims for reimbursement constitute prohibited referrals under Stark and are in violation of the AKS.

107.     In 2016, while Dr. Kansal's total compensation was approximately \$505,783 or at about 50% of the MGMA, his productivity did not support this level of compensation. His work

24

RVUs are less than 10% of the MGMA, however his compensation is in the 50% range, as represented in the following chart:

| Physician | Department | Total Comp for 2016 | Compensation compared to MGMA | wRVUs compared to MGMA |
|---|---|---|---|---|
|  |  |  |  |  |
| **Kansal** | Vascular Surgery | $505,783 | 50% | <10% |
|  |  |  |  |  |

108.    Further, the compensation paid to Dr. Kansal exceeded the value of collections obtained by SMG for his professional services. For example, in 2016, he was paid over 190% more than SMG collected in payments for Dr. Kansal's professional services.

109.    Although Dr. Kansal's total compensation exceeded the amount of money Defendants received from payers for his medical services, and his work RVUs did not support his compensation, Defendants accepted these losses and effectively subsidized his practice. Defendants did this because Dr. Kansal referred nearly all of his patients to Steward's operating rooms, where Defendants profited handsomely by billing for the technical/facility reimbursement associated with the patients' surgeries. These referrals eliminated the projected losses Defendants took on Dr. Kansal's practice.

110.    This financial arrangement through Dr. Kansal's employment contract that operated at a loss and was only profitable if technical/facility reimbursements were considered, was essentially an inducement paid to him for referrals of inpatient and outpatient hospital services.

111.    Throughout the relevant period, Dr. Kansal referred patients to Steward hospitals for inpatient and outpatient medical care, including surgical procedures.

112.    Since 2013, Dr. Kansal has performed vascular surgeries on numerous Medicare patients. For these procedures, Defendants St. Elizabeth's and Steward have been able to bill and obtain reimbursement for the technical/facility fees connected with these surgical procedures. For example, for 2016, St. Elizabeth's obtained over \$2.6 million in technical/facility reimbursement for inpatient and outpatient encounters for patients seen by Dr. Kansal. Of that amount, over \$1.2 million was attributable to Medicare and Medicaid patients.

## D.    The Employment Contract with Dr. Cambria

113.    From June 1, 2017 to the present, Defendants have paid Dr. Cambria excessive compensation in order to retain his services and ensure his substantial referral stream. Exhibit H. Dr. Cambria is a vascular surgeon who joined Steward as the System Chief of Vascular Surgery in June 2017.

114.    Every time Dr. Cambria performs a surgical procedure (or sees a patient on an inpatient or outpatient basis), Defendants are able to bill for the inpatient and outpatient services and obtain reimbursement for the associated technical/facility fees. These claims for reimbursement constitute prohibited referrals under Stark and are in violation of the AKS.

115.    From June through December 2017, Dr. Cambria's total compensation was approximately \$583,000 which was above the 70th percentile of physician compensation on the MGMA. However, his productivity did not support his compensation. His work RVUs were in the range of less than 30% of the MGMA table, while his compensation was greater than 70%, as represented in the following chart:

| Physician | Department | Total Comp for 2017 and 2018 | Compensation compared to MGMA | wRVUs compared to MGMA |
|-----------|-----------|-------------------------------|-------------------------------|------------------------|
|           |           |                               |                               |                        |

| Cambria | Vascular Surgery | $583,000 | >70% | <30% |
| Cambria | Vascular Surgery | $1,000,000 | >90% | |
| | | | | |

116.    His total anticipated compensation for 2018 is $1 million, which is above the 90th percentile of physician compensation on the MGMA.

117.    Further, the compensation paid to Dr. Cambria vastly exceeded the value of anticipated collections obtained by SMG for his professional services. For example, in 2017, SMG estimated that it would collect approximately $189,000 in payments for Dr. Cambria's professional services. So although for his professional services SMG only projected earning about $189,000, Dr. Cambria was paid approximately $583,000. In other words, he was paid roughly 308% more than his probable collections.

118.    Although Dr. Cambria's total compensation far exceeded the amount of money Defendants received from payers for his professional medical services, and his work RVUs did not support justify his high compensation, Defendants accepted these losses and effectively subsidized his practice. Defendants did this because Dr. Cambria referred nearly all of his patients to Steward's operating rooms, where Defendants profited handsomely by billing for, and receiving the technical/facility reimbursement associated with the patients' surgeries. These referrals eliminated the projected losses Defendants took on Dr. Cambria's practice.

119.    This financial arrangement through Dr. Cambria's employment contract that operated at a loss and was only profitable if technical/facility reimbursements were considered, was essentially an inducement paid to him for referrals of inpatient and outpatient medical care, including surgical procedures.

27

120. Throughout the relevant period, Dr. Cambria referred patients to Steward hospitals for inpatient and outpatient medical care, including surgical procedures.

121. Since 2017, it was projected that Dr. Cambia would perform approximately 300 vascular surgeries, including surgeries on roughly 100 Medicare patients. For these procedures, Defendants St. Elizabeth's and Steward would have been able to bill and obtain reimbursement for the technical/facility fees connected with these surgical procedures. For example, for 2017, St. Elizabeth's and Steward projected, in an internal business plan, obtaining over $5.7 million in technical/facility reimbursement for inpatient and outpatient encounters for patients seen by Dr. Cambria. Of that $5.7 million, over $3.4 million was attributable to Medicare and Medicaid patients for the year 2017 alone.

## E. The Employment Contract with Dr. Scott R. Johnson

122. From approximately 2014 to the present, Defendants have paid Dr. Johnson excessive compensation in order to retain his services and ensure his substantial referral stream. Dr. Johnson provides general surgical services at Defendant St. Elizabeth's.

123. Every time Dr. Johnson performs a surgical procedure (or sees a patient on an inpatient or outpatient basis), Defendants are able to bill and obtain reimbursement for the associated technical/facility fees. These claims for reimbursement constitute prohibited referrals under Stark and are in violation of the AKS.

124. His total compensation has consistently exceeded fair market value and been commercially unreasonable.

125. His total compensation has consistently exceeded the 90th percentile of the MGMA.

126. For example, for 2016, Dr. Johnson's total compensation exceeded $500,000 and was above the 80th percentile of the MGMA table. However, his productivity did not support his

28

compensation. His work RVUs were in the 30% range, while his compensation was at 80% of the

MGMA, as represented in the following chart:

| Physician | Department | Total Comp for 2016 | Compensation compared to MGMA | wRVUs compared to MGMA |
|-----------|-----------|---------------------|-------------------------------|------------------------|
| | | | | |
| Johnson, Scott | General Surgery | $523,948 | >80% | 30% |
| | | | | |

127.    Further, the compensation paid to Dr. Johnson exceeded the value of collections

obtained by Defendant SMG for his professional services. For example, in 2016, SMG collected

only approximately $389,453 in payments for his work.

128.    Although Dr. Johnson's total compensation exceeded the amount of money

Defendants received from payers for his professional services, Defendants accepted these losses and

effectively subsidized his practice. Defendants did this because Dr. Johnson referred nearly all of

his patients to Steward's and St. Elizabeth's operating rooms, where they profited handsomely by

billing for the technical/facility reimbursement associated with the patients' surgeries. These

referrals eliminated the projected losses Defendants took on Dr. Johnson's practice.

129.    Throughout the relevant period, Dr. Johnson referred patients to Steward hospitals

for inpatient and outpatient medical care, including surgical procedures. As a result, Defendants

have obtained substantial technical/facility reimbursement associated with the referrals for medical

care and surgical procedures.

130.    For 2016, for example, Defendants collected over $4.3 million in reimbursement

for technical/facility fees associated with Dr. Johnson's services. Of that amount, over $1.6 million

was Medicare/Medicaid reimbursement.

## F.    The Specified Physicians' Employment Contracts Violated Stark and the AKS

131.    Despite consistently paying the specified physicians more than the amount
collected in professional services reimbursements, Defendants still made a substantial amount of
money billing for referrals of inpatient and outpatient hospital services and obtaining the associated
technical/facility reimbursements.

132.    Given that these physicians were paid total compensation that exceeded the
collections received for their professional services, Defendants could not reasonably have concluded
that the compensation arrangements in the physicians' contracts were fair market value or
commercially reasonable.

133.    Furthermore, given that these physicians' compensation was not justified by the
amount of work that they were doing (*i.e.,* their wRVUs), Defendants could not reasonably have
concluded that the compensation arrangements in their contracts were fair market value for their
services or commercially reasonable.

134.    Lastly, given that their compensation took into account the volume or value of
referrals or other business generated through referrals of designated health services, such as inpatient
and outpatient hospital services, Defendants could not reasonably have concluded that the
employment agreements did not violate the Stark Statute or the AKS.

135.    Based on the contractual and financial relationships between the physicians and
Defendants, none of the statutory or regulatory exceptions to Stark or the AKS apply.

## G.    Defendants Acted with the Requisite Knowledge

136.    Defendants knew that the compensation paid to these physicians was excessive and
in violation of Stark and the AKS.

137.    Defendants knew this based on each hospital's yearly budget meeting at which Defendants' executives discussed and analyzed each physician's compensation package, work RVUs, and profits and losses.

138.    In August 2016, the yearly budget meeting took place at Defendant SMG's office. Those in attendance at the budget meeting included the CEO of St. Elizabeth's (Beth Hughes), the President of SMG (Dr. Shetty), the EVP of SMG (Dr. Callum), the COO at SMG (David Francis), the SVP of SMG (Mark Scheyer), the CFO of SMG (Ashley Koch), SMG analysts, the Director of Finance of St. Elizabeth's (Jason Levine) and Relator. They discussed and analyzed each physician's profit and losses, work RVUs and compensation.

139.    At the meeting, it was clear that Defendants were paying the physicians excessive compensation and only receiving a smaller amount in professional services reimbursement in return. These "losses" were reflected on the spreadsheet used at the budget meeting. The spreadsheet further showed the specified physicians' total compensation, wRVUs and the specific percentiles from the MGMA compensation and wRVUs tables. Thus, it was obvious that the specified physicians' outsized compensation was not justified by the work being performed and was not in line with other physicians' compensation based on the MGMA table.

140.    Further, Defendants failed to follow their own written policies when hiring new physicians. While Defendants' written policies called for a particular procedure for hiring new physicians, including a fair market value evaluation to support the physician's compensation, these policies were rarely (if ever) followed in practice. In Relator's experience, there was not a fair market value analysis conducted before hiring a particular physician. Instead, Defendants merely compiled an Excel business plan showing, *inter alia*, the anticipated hospital technical/facility reimbursement. For example, for Dr. Cambria, the "margin analysis" showed that Defendants would

31

earn over \$2.5 million per year if he performed 300 vascular cases a year. Physician hiring and compensation were based on and/or justified by this analysis.

141. Thus, in determining the amount of compensation to pay to physicians, Defendants took into account the value and volume of referrals each physician would make or made in the form of technical/facility reimbursement for inpatient and outpatient hospital services.

142. Relator's experience working at Defendant St. Elizabeth's was in stark contrast to his current position at another hospital. At Relator's current hospital, there is a standard procedure in place for vetting physician compensation arrangements, which includes utilizing an outside company to perform fair market value assessments for all physician compensation agreements.

## X. DEFENDANTS STEWARD AND ST. ELIZABETH'S FRAUDULENTLY UPCODED AND BILLED USING THE 25 MODIFIER

143. Beginning prior to 2016, Defendants Steward and St. Elizabeth's have fraudulently upcoded physician office visits by improperly using the 25 modifier. This has led to Defendants improperly retaining approximately \$8.5-\$9.5 million in overpayments for the 2016-2017 calendar years, in Relator's estimation. Although Steward has been aware of these overpayments since at least June 9, 2017 when it received the results of an audit, Steward has not paid back any money to the government as a result of these overpayments.

144. According to Medicare billing rules, in most cases when a physician performs a medical procedure, the reimbursement for the pre- and post-operative care that is necessary for the patient is covered by the payment for the procedure itself. However, in those instances where evaluation and management ("E&M") services are necessary due to a different presenting problem with the patient, the physician may bill for a separate E&M code. In order to signal to Medicare that a separate E&M code is to be reimbursed in addition to the procedure code, the E&M code is submitted with modifier 25.

32

145.    In around April 2017, Defendant Steward hired Craneware to do a claims analysis of its hospital billing. Craneware's audit revealed that Steward hospitals were consistently overusing the 25 modifier as the 25 modifier was "hard-coded" into the billing system.

146.    In other words, Defendant Steward's billing process routinely and improperly used modifier 25, by routinely adding it to procedures, not just where there was a different presenting problem and separately identifiable E&M service. As stated above, the modifier 25 was hard-coded into the billing system and, thus, was added to procedures whether justified or not.

147.    The Craneware audit revealed this billing impropriety. Relator estimates that around 50% of all billing using the 25 modifier were incorrect. Further, Relator estimates that this improper billing resulted in approximately $4.5 million in over-reimbursements for St. Elizabeth's and probably about $4-5 million in over-reimbursements for the other Steward hospitals combined. He believes that St. Elizabeth's over-reimbursement was greater because it had the most hospital-based clinics at which the modifier 25 was most often used. Thus, in total, Defendants improperly retained approximately $8.5-9.5 million in overpayments over the 2016-2017 calendar years.

148.    Craneware submitted its audit report to Steward's centralized business department, specifically to the Senior Vice President of Revenue Operations, Neville Zar. The audit report was later shared with the CFOs of all the hospitals, including Relator who was the CFO of St. Elizabeth's. Relator shared the audit results with Elizabeth Gifford, Regional Director of Compliance on November 9, 2017. Ms. Gifford then reported the findings to Karen Murray, VP, Chief Compliance Officer at Steward, on or around November 14, 2017. Steward did not take any steps to re-pay the over-reimbursements to Medicare and to the best of Relator's knowledge, does not have any plans to re-pay any of the money. Steward's approach was to fix the modifier 25 process going forward. In other words, remove the "hard-coding" of the modifier 25 in their billing

33

system and ensure that each department developed modifier 25 guidelines. Although this was their stated plan, as of December 2017, according to Relator's knowledge, no changes had been made to the billing system to correct the over-use of modifier 25.

## XI. DEFENDANTS SUBMITTED OR CAUSED TO BE SUBMITTED FALSE AND FRAUDULENT CLAIMS AND STATEMENTS

149. With regard to the excessive physician compensation claim, the physicians specified herein referred patients, including Medicare and Medicaid patients, in violation of Stark and the AKS.

150. Defendants St. Elizabeth's and Steward, in turn, presented, or caused to be presented through the MAC, claims for payment to the Medicare program for designated health services provided on referrals from the physicians with whom they had entered into prohibited financial relationships as set forth herein. Defendants also presented, or caused to be presented to Massachusetts, claims for payment to MassHealth for designated health services provided on referrals from the physicians with whom they had entered into prohibited financial relationships as set forth herein. Defendants thereby obtained payments from the United States and Massachusetts in violation of Stark and the AKS.

151. Under Section 3729(a)(1)(A) of the FCA and Section 5B(a)(1) of the Massachusetts FCA, the claims discussed above were false and/or fraudulent because Defendants were prohibited by Stark and the AKS from obtaining payment from the United States and Massachusetts for claims for designated health services based on referrals from the physicians with whom they had entered into prohibited financial relationships.

152. Defendants also violated Section 3729(a)(1)(B) of the FCA and Section 5B(a)(2) of the Massachusetts FCA, by making false statements, or causing false statements to be made by the MAC, to get claims paid by Medicare and MassHealth for designated health services based on

34

referrals from the physicians with whom they had entered into prohibited financial relationships. Defendants' certifications on its costs reports that its statements were "true" and/or "correct" and that it was entitled to payment of its claims for such services were false or fraudulent because Stark and the AKS prohibited Defendants from receiving payments from the United States and Massachusetts for those claims.

153.    Lastly with regard to the improper billing claim, Defendants Steward and St. Elizabeth's knowingly concealed or avoided an obligation to pay or transmit money to the United States, by failing to refund reimbursements received through improper billing as uncovered by an audit in 2017, in violation of Section 3729(a)(1)(G) of the FCA.

## XII.    COUNTS

### COUNT I
### FEDERAL FALSE CLAIMS ACT,
### 31 U.S.C. § 3729(a)(1)(A)

154.    Relator incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

155.    Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval for reimbursement for designated health services rendered to patients who were referred by physicians with whom Steward/SMG had entered into prohibited financial relationships, in violation of 31 U.S.C. § 3729(a)(1)(A).

156.    These claims were false or fraudulent because they were made in violation of the Stark Statute and the AKS.

157.    Said claims were presented or caused to be presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

### COUNT II
### FEDERAL FALSE CLAIMS ACT,

## **31 U.S.C. §3729(a)(1)(B)**

158.   Relator incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

159.   Defendants made, used, and caused to be made or used, false records or statements – *i.e.,* the false certifications and representations made and caused to be made by St. Elizabeth's and Steward when initially submitting the false claims for payments, and the false certifications made by Steward in submitting the cost reports – material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(B).

160.   The false certifications and representations made and caused to be made by Defendants were material to the United States' payment of the false claims.

161.   Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

## **COUNT III**
## **FEDERAL FALSE CLAIMS ACT,**
## **31 U.S.C. § 3729(a)(1)(G)**

162.   Relator incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

163.   Defendants knowingly concealed or avoided an obligation to pay or transmit money to the United States, by failing to refund reimbursements received through improper billing as uncovered by an audit in 2017, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

164.   Defendants acted with actual knowledge of their obligation, or with reckless disregard or deliberate ignorance of their obligation.

## **COUNT IV**
## **MASSACHUSETTS WHISTLEBLOWER LAW: THE FALSE CLAIMS ACT,**
## **MASS. GEN. LAWS ANN. CH. 12 §§ 5B(a)(1), (2)**

165.     Relator incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

166.     Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval for reimbursement for designated health services rendered to patients who were referred by physicians who had entered into prohibited financial relationships, in violation of Section 5B(a)(1) of the Massachusetts FCA.

167.     Defendants made, used, and caused to be made or used, false records or statements – *i.e.,* the false certifications and representations made and caused to be made by St. Elizabeth's and Steward when initially submitting the false claims for payments, and the false certifications made by Steward in submitting the cost reports – material to a false or fraudulent claim in violation of Section 5B(a)(2) of the Massachusetts FCA.

## REQUESTS FOR FOR RELIEF

WHEREFORE, Relator, on behalf of the United States and the Commonwealth of Massachusetts, demands that judgment be entered in his favor and against Defendants for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count.

This includes, with respect to the Federal False Claims Act, three times the amount of damages to the Federal Government plus civil penalties of no more than $22,363 and no less than $11,181 for each false claim, and any other recoveries or relief provided for under the Federal False Claims Act.

This Request also includes, with respect to the Massachusetts False Claims Act, the maximum damages permitted and the maximum fine or penalty permitted by that Statute, and any other recoveries or relief provided for under the law.

Further, Relator requests that he receive the maximum amount permitted by law of the

proceeds of this action or settlement of this action collected by the United States and

Massachusetts, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and

costs. Relator requests that his award be based upon the total value recovered, both tangible and

intangible, including any amounts received from individuals or entities not parties to this action.

## DEMAND FOR JURY TRIAL

A jury trial is demanded in this case.

Dated: June 1, 2018                    Respectfully submitted,

Jonathan Shapiro
BBO No. 454220
Shapiro Weissberg & Garin LLP
90 Canal Street, Suite 500
Boston, MA 02114
Telephone: 617-742-5800
jshapiro@swglegal.com

Berger & Montague, P.C
Joy Clairmont, Esq.
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3049
jclairmont@bm.net

*Counsel for Relator*

## CERTIFICATE OF SERVICE

I hereby certify that I have caused a copy of the above **Complaint** to be served on the

following counsel by certified mail with return receipt requested:

United States Attorney General Jeff Sessions
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC  20530-0001

U.S. Attorney Andrew E. Lelling
U.S. Attorney's Office
District of Massachusetts
John Joseph Moakley
United States Federal Courthouse
1 Courthouse Way, Suite 9200
Boston, MA  02210

AUSA Gregg Shapiro
U.S. Attorney's Office
District of Massachusetts
John Joseph Moakley
United States Federal Courthouse
1 Courthouse Way, Suite 9200
Boston, MA  02210

Maura Healey, Attorney General
Commonwealth of Massachusetts
One Ashburton Place, Room 1813
Boston, MA 02108-1518

By: */s/ Joy P. Clairmont* _____
Joy P. Clairmont