# EXHIBIT 12

# This document is being produced natively.

HIGHLY CONFIDENTIAL - FOIA CONFIDENTIALITY TREATMENT REQUESTED                    SHC-H-00067711



# Steward Physician Contracting Compliance Overview, Process and Policies

## April 1, 2015

# Overview

- Steward contracting policies are designed to ensure compliance with very technical and highly complicated laws

- All financial arrangements with a physician or a group <u>must</u> be in writing <u>before</u>:
  - Services are rendered; **or**
  - Payment is made

    *Providing any item or service that benefits physicians or groups raises compliance questions that must be addressed before the arrangement begins.*

- All arrangements must be FMV and commercially reasonable



2

# Policies and Procedures

- Steward policies cover ANY & ALL arrangements with physicians
  - MD agreements/contracts
    - Employment Agreements
      - Full Time, Part Time, Per Diem, Moonlighters
    - Medical Directorships
    - Coverage Arrangements
  - Leases
  - Physician-owned vendor agreements



3

# Regulatory Overview

- Fraud and  Abuse Laws

  - Stark Law, Federal Anti-Kickback Statute (AKS), False Claims Act, Civil Monetary Penalties Law

- Recent Settlements



4

# November 13, 2013…$85M

Halifax Hospital Medical Center settles with DOJ after being accused of entering into financial relationships with medical oncologists and neurosurgeons in violation of Stark and FCA (incentive bonuses took into account the volume or value of the physician's referrals to the hospital because fees for DHS were included in the bonus pool)

# October 1, 2013…$238M

Award of damages after a jury trial against Tuomey Healthcare System regarding allegations that physician employment agreements violated the Stark law (in excess of FMV and based on the volume of business generated)

# April 3, 2013….$25.5M

Intermountain Health Care settles with DOJ following self-disclosure of unlawful financial relationships with physicians (payment took into account volume/value of referrals, unwritten leases, unwritten physician service agreements)



5

# Stark Law

Prohibition

- If a physician (or an immediate family member)
- Has a "financial relationship" with an entity
- The physician may not make a "referral" to that entity
- For "designated health services"
- Unless an exception applies

AND

- An entity may not bill Medicare
- For "designated health services"
- Rendered pursuant to a prohibited referral



# What is a financial relationship?

- A financial relationship is *anything of value*.

- This could be pay, rent, goods, services, supplies, or anything else that has a value, no matter how small the value (i.e. incidental medical staff benefits, such as parking, meals, etc.).



# What is a referral?

- Broader than a physician order.
- A request by a physician for an item or service payable under Medicare, including:
  - the request by a physician for consultation with another physician, and any test or procedure ordered or performed by such other physician; or
  - a request by a physician for the establishment of a plan of care that includes the provision of a DHS.
- Exception: services personally performed by a referring/ordering physician

*Note: DHS services furnished by employees of, or other members of the same group practice as, the ordering physician <u>are</u> referrals*



8

# What are designated health services?

Designated Health Services (DHS) include the following categories:

- clinical laboratory services;

- physical therapy services;

- occupational therapy and speech-language pathology services;

- radiology services, including nuclear medicine, MRI, CAT scans, and ultrasound services;

- radiation therapy services and supplies;

- durable medical equipment and supplies;

- parenteral and enteral nutrients, equipment and supplies;

- prosthetics, orthotics, and prosthetic devices and supplies;

- home health services;

- outpatient prescription drugs; and

- inpatient and outpatient hospitalization services



9

# What Should I Remember?

- All financial relationships between physicians and hospitals implicate Stark

- The financial arrangement <u>does NOT</u> have to involve the service for which the patients are referred.

- Most Stark exceptions require a signed contract be in place <u>before</u> <u>any services are rendered</u> or any payment is made.



# What are the penalties?

- Absolute requirement to repay all claims for Medicare services furnished pursuant to prohibited referral

- Civil monetary penalties of up to $15,000 per service

- Exclusion from Federal programs

- Potential false claims liability



# What are some common exceptions?

- Compensation
    - Employment
    - Personal Services
    - Leases
    - Fair Market Value
- Physician Recruitment
    - Special rules regarding recruitment into group
        - Incremental expenses only
        - No "unreasonable" practice restrictions
- Nonmonetary compensation
    - $392 (indexed)
- Incidental medical staff benefits
    - $33 (indexed)



12

# General Requirements

- In writing
- One-year term
- Fair market value
- Set in advance
- Cannot "take into account" referrals
- Commercially reasonable



13

# Anti-Kickback Statute

- AKS **prohibits** offering or payment of any remuneration (in cash or in kind, overtly or covertly, directly or indirectly) <u>to induce</u> another to:
  - Refer patients for services
  - Purchase, lease, or order items or services
  - Arrange for or recommend the purchase, lease, or order of items or services

- The knowing and willful <u>solicitation or acceptance</u> of any remuneration <u>in return for</u> the above



14

# Anti-Kickback Statute (cont'd)

- Note:  Anti-Kickback Statute (unlike Stark Law) is not just concerned with referrals
  - <u>Purchase, lease or order</u> – means even common and unremarkable inducements by manufacturers, wholesalers, and retailers (health care suppliers, facilities and practitioners) implicate the AKS
    - E.g., Discounts, rebates, and value-added items and services by manufacturers or wholesalers
    - E.g., Routine waiver of patient's cost-sharing by a hospital or medical practice
    - E.g., "Patient assistance program" funded by one or more pharma companies
  - <u>Arranging for or recommending the purchase, order or lease</u> – means even common and unremarkable payments to group purchasing organizations (i.e., administrative fees) and payments to sales and marketing organizations implicate the AKS



15

# Anti-Kickback Penalties

- # Criminal Penalties
  - Up to 5 years imprisonment per violation; and/or
  - Fine of up to $25,000 per violation
  - Note:  Criminal conviction triggers mandatory exclusion from Federal Programs

- # OIG Administrative Penalties
  - $50,000 civil penalty per violation and assessment of up to three times the amount of the illegal remuneration
  - Exclusion from Federal Programs
  - Note:  OIG does not have to meet any burden of proof unless the fined or excluded party appeals to an ALJ



16

# False Claims Act

- Illegal to submit claims for payment to Medicare or Medicaid that you know or should know are false or fraudulent

- Types of Issues:
  - Medical necessity
  - Improper supervision
  - Double billing (e.g., covered in global fee)
  - Upcoding



# Civil Monetary Penalties

- Offering or transferring remuneration to a beneficiary that a person "knows or should know is likely to influence such individual to order or receive" covered services from a particular provider

- $10,000 - $50,000 per violation



18

*Steward's physician contracting policies are designed to ensure compliance with these technical and complicated laws*



19

# Test Your Knowledge



# Example 1

A physician group approaches the hospital president and asks about renting office space in the hospital's MOB.  The parties do some research and determine a FMV rent.  The group moves in and begins paying the hospital the agreed-upon rent.

Is this arrangement ok?



No, the parties have not entered into a fully executed written lease



22

# Example 2

Hospital realizes on Friday that it has no coverage in a certain department for the weekend.  Hospital arranges for a physician to cover over the weekend at a FMV rate and requests a written agreement on Monday. The Hospital clearly informs the physician that it cannot pay for the coverage until the contract is fully executed.

Is this ok?



No, a fully executed agreement must be in place prior to services being rendered (and before payment is made).



# Example 3

Hospital has a written, fully executed agreement with a group for coverage and chair of a department.  As time goes on, it turns out that one physician in the group is providing all services under the agreement himself.  The hospital agrees to pay the physician directly, and the group agrees with this arrangement.

Is this ok?



No, amendments to agreements must be in writing, signed by both parties.  In this case, the original agreement should be terminated (because there is no longer an agreement with the group) and a new agreement executed among the hospital and physician.  If the physician is contracting in his individual capacity, the new agreement will be a PT hospital EA.



26

# Example 4

SMG and an independent physician enter a proper, fully executed written lease agreement.  The physician subleases one of three offices in a suite leased by SMG (with certain shared common areas). After 3 months, the parties agree that both practices could benefit from additional shared printers.  The parties split the cost of the printers and the ongoing maintenance and supplies (i.e. toner, paper) proportionately (1/3 physician, 2/3 SMG).

Is this ok?



27

No.  The new arrangement must be documented either as a lease amendment or new agreement



28

# Example 5

A physician serves as a medical director at the Hospital. A contract was never executed, but these services are purely administrative, and no billing is involved.

Is this ok?



No. A contract needed, as this is a financial relationship with a physician – it does not matter that the services are purely administrative.



# Example 6

Hospital is interested in marketing its new outpatient clinic, which is staffed by two SHCN physicians and two SMG physicians. The brochure and website urge patients to make an appointment and include contact information for all four providers. These four providers are the only providers in the specialty on the Hospital's Medical Staff.

Is this ok?



31

Hospital marketing materials should avoid promoting private physician services.

Under the Stark law "exception" for Medical staff incidental benefits, a hospital may list all physicians on its medical staff in a directory or on its website.  Marketing activity that goes beyond such limited incidental benefit can be viewed as an in-kind payment to a physician and, therefore, can raise a compliance issue/concern.

Where marketing activities have a direct benefit to a physician, it may be necessary to have a written agreement, under which the physician shares some of the marketing/promotion expense.



32

# Example 7

Hospital enters into a coverage arrangement with a physician owned group under which several nurse practitioners employed by the group will provide services at the Hospital.  No physician services will be rendered.  Is a contract needed for these nurse practitioner services?



- Yes, this is a financial arrangement with a physician-owned group, and is subject to the physician contracting rules. It does not matter who in the group will perform the services.



34

# Key Elements of Process

- Hospital Arrangement Workflow

- SMG Employment Agreement Workflow

- Supporting Tools

- Fair Market Value (FMV) Justification

- Business Judgment Factors



# Hospital Arrangement Workflow

- Complete Business Judgment Factors (BJF)
    - Final version must be approved (in writing or via email) by the hospital president, President, Steward Hospitals and SMG COO

- Send final BJF and all approvals to Christine Kady

- Christine forwards all documents to legal to draft agreement

- Legal emails final agreement to the person at the hospital who requested it

- Hospital is responsible for distributing the agreement to the other Party and getting their signature
    - *AGREEMENT MUST BE FULLY EXECUTED BEFORE SERVICES BEGIN OR PAYMENT IS MADE*

- Agreement and supporting documentation returned to Christine to arrange for SMG President to sign
    - Business judgment factor document
    - All written or email approvals
    - Two copies of the agreement (signed by Parties – both hospital and physician/group)

- Once SMG President signs, fully executed agreement is added to the contract database and then mailed back to the hospital
    - Hospital should retain one copy, and return the other copy to the physician/group
    - Hospital/SMG is responsible for maintaining time sheets, if applicable

    *Incomplete documents or inadequate approvals will delay the agreement from being drafted



# SMG Employment Agreement Workflow

- Complete the Business Plan Request Form via Salesforce
  - Final version must be approved by the hospital president and SMG COO

- Complete Business Judgment Factors (BJF) via Salesforce
  - Final version must be approved by the hospital president and SMG COO

- Identify physician with Network Development team

- Complete Contract Information via Salesforce and submit for approval by the hospital president and SMG COO

- Salesforce will automatically generate an email to Christine Kady requesting that an employment agreement be drafted, once all approvals are received

- Christine drafts the agreement (legal must review if anything outside the ordinary is requested)

- Cover Letter is sent to SMG President for signature along with employment agreement

- Employment Agreement and Cover Letter are mailed via FedEx to the physician

- Employment Agreement is returned to Christine to arrange for SMG President to sign

- Employment Agreement is added to the contract database and a copy is returned to the physician



*Incomplete documents or inadequate approvals will delay the agreement from being drafted

37

# Provider Lease Agreements Workflow

- Provider Lease Agreements Lease initiator develops business plan to determine lease requirements, utilizes Corporate Real Estate & Facilities (CREF) as strategic resource
    - Secure the following Business Plan approvals on Real Property Lease Request Form:
        - Hospital Vice President, Finance; Hospital President; Vice President, Corporate Real Estate & Facilities; and General Counsel
        - SMG transactions require the following additional approvals: SMG Chief Financial Officer; SMG Chief Operating Officer; and SMG Vice President of Operations

- Provide CREF with the proposed business terms on Real Property Lease Request Form
- CREF will initiate compliance review and secure fair market value analysis
- CREF will provide DRAFT lease document to Office of General Counsel for review, comment and approval
- CREF will produce FINAL lease document for execution
- CREF will enter lease transaction into the CREF Lease Administration Database
- CREF will maintain authoritative transaction documents

*Notes: Leases are maintained in Corporate Real Estate database, and vendor arrangements are maintained in Supply Chain database.  There is a  separate process for commercial lease agreements.*



38

# Supporting Tools

- Business Plan Templates
  - SMG Employment Agreements
  - Income Guarantees
- Business Judgment Factor/FMV Templates
  - Must include correct salary and MGMA/ Sullivan Cotter comparison
  - Must include a highlighted copy of the MGMA/ Sullivan Cotter page(s) used to determine FMV
  - Must be specific to the physician arrangement
  - Attestation that based on MGMA/ Sullivan Cotter comparison and other qualities that Compensation is FMV (check box to attest to FMV)
  - Must tie to Business Plan compensation arrangement
- All Documents (policies, request form templates, and benchmarking data) on SMG Intranet

Benchmarking Data:
http://mysteward/CaritasPN/Document%20Library/Forms/AllItems.aspx?RootFolder=%2fCaritasPN%2fDocument%20Library%2fPhysician%20Services%2fBenchmarking%20Data&View=%7bEED80981%2dDAFB%2d49B4%2dABAD%2dEE82802DAAE6%7d

Physician Agreement Request Forms/ Policies:
http://mysteward/CaritasPN/default.aspx?RootFolder=%2fCaritasPN%2fDocument%20Library%2fPhysician%20Services%2fNew%20MD%20Arrangements&View=%7bA523FE4A%2d1A6C%2d4CAE%2dB8D1%2d5AABF5C2CE73%7d



# Fair Market Value (FMV) Justification

- MGMA /Sullivan Cotter Survey Comparison
- Other "Business Judgment" qualities to support FMV if over 75%tile (see examples on next page)
- Clinical and Administrative dollars must be valued separately
- Should take billing into consideration when determining if rate is FMV if physician will do the professional billing
- Compensation terms that are not standard to all physicians should be added into total compensation to calculate FMV, including:
  - CME/ Professional Expense reimbursement
  - Malpractice insurance
- Additional compensation should be added into total compensation to calculate FMV, including:
  - Signing Bonus
  - Incentive Compensation
  - Moving Allowance
  - Loan Repayment



# Business Judgment Factors

Example business judgment factors which are typically considered to be compelling and relevant support for physicians with upper-level compensation (any documentation to support these factors makes the case more compelling, but are not necessarily required):

- The physician has received competing written job offers at comparable or higher levels of compensation than that considered in our analysis.
- The position was open for some time and other physicians rejected offers of compensation at lower levels than that offered to the incumbent.
- The physician was earning a comparable level of compensation when recruited.
- The physician has unique sub-specialization/skills within the general medical specialty.
- Local market shortages exist(ed) in the physician's specialty/subspecialty.
- The physician has demonstrated and documented relative measures of performance within his/her group/specialty as compared to internal and external benchmark norms (e.g., higher patient satisfaction, quality and clinical outcomes relative to both internal and external benchmarks).
- The reputation of the physician within the community (local community at large and medical community).
- The wRVU productivity level of the physician is significantly higher than his/her collections level, reflective of the indigent/under-insured patient population served.

Additionally, the types of factors in the areas of patient satisfaction and quality that provide strong support for physicians with upper-level compensation may include:

- The physician has achieved upper decile (or perhaps upper quartile) rankings on questions related to "Overall Rating of Care" and "Recommendation to Family/Friends" on the Press Ganey, NRC Picker, or other independent patient satisfaction survey(s).
- The physician has achieved upper decile (or perhaps upper quartile) rankings on clinical outcome and/or quality of care metrics relevant to the respective physician's specialty/sub-specialty area of practice as measured by state-/nationally-recognized tracking and reporting systems (e.g., CMS's PQRI).
- The physician has been recognized by payers for high quality of service.
- The physician has been recognized in a listing of "Best Doctors."

