## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **United States of America, Commonwealth of Massachusetts, ex rel. Joseph Nocie,** | |
| **Plaintiff,** | **No. 18-cv-11160-WGY** |
| **v.** | |
| **Steward Health Care System, LLC, Steward Medical Group, Inc., Steward St. Elizabeth's Medical Center of Boston, Inc., and Steward Carney Hospital, Inc.,** | |
| **Defendants.** | |

## **PLAINTIFF-RELATOR'S AMENDED COMPLAINT**

# TABLE OF CONTENTS

I.      NATURE OF ACTION ................................................................................ 1

II.     JURISDICTION AND VENUE ................................................................. 4

III.    PROCEDURAL HISTORY ......................................................................... 4

IV.     PARTIES ...................................................................................................... 5

V.      THE FEDERAL FALSE CLAIMS ACT AND MASSACHUSETTS
        FALSE CLAIMS ACT ................................................................................ 7

VI.     BACKGROUND REGARDING MEDICARE AND MEDICAID ................. 8

        A.    The Medicare Program ....................................................................... 8

        B.    The Medicaid Program:  MassHealth ............................................... 9

        C.    Medicare and MassHealth Enrollment by Providers and Hospitals .......... 10

VII.    MEDICARE AND MASSHEALTH BILLING LAWS, RULES
        & REGULATIONS ...................................................................................... 11

        A.    Medicare and Medicaid Reimbursement ........................................... 11

        B.    Claims Submitted to Medicare and MassHealth for Reimbursement
              Certify Compliance with the Law, Rules and Regulations ..................... 11

              1.   Facility Fee Claim ................................................................... 12

              2.   Professional Fee Claim............................................................ 13

        C.    Billing Medicare for E&M Services, Minor Surgical Procedures
              and Diagnostic Tests .......................................................................... 14

        D.    Billing MassHealth for E&M Services, Minor Surgical Procedures
              and Diagnostic Tests .......................................................................... 17

VIII.   DEFENDANTS KNOWINGLY SUBMITTED OR CAUSED THE
        SUBMISSION OF FALSE CLAIMS TO MEDICARE AND MASSHEALTH
        BY BILLING FOR EVALUATION & MANAGEMENT SERVICES THAT
        WERE NOT PROVIDED OR WERE NOT APPROPRIATELY AND
        SUFFICIENTLY DOCUMENTED.............................................................. 17

        A.    Defendants Were Aware of the Overbilling Risk Associated with
              the Use of Modifier 25 in Billing for E&M Services............................. 19

        B.    Defendants Did Not Have Uniform Policies and Procedures Or
              Guidelines On The Correct Use Of Modifier 25 In Billing for
              E&M Services Nor Did They Provide Training to the Clerical
              Staff Handling the Billing .................................................................. 20

        C.    Auditors in 2017 Alerted Defendants that Their Use of Modifier 25
              Presented a Compliance Risk ............................................................. 21

i

D.   Defendant Steward Kept Their Compliance Department in the Dark but Relator Attempted to Escalate the Issue (Unsuccessfully)................................... 23

E.   Defendants Failed to Review for Accuracy Claims with Modifier 25 Appended, only Reviewed Claims *Without* Modifier 25 ........................... 24

F.   Defendants Have Not Changed Their Fraudulent Practices.................................... 25

IX.   DEFENDANTS SUBMITTED OR CAUSED TO BE SUBMITTED FALSE AND FRAUDULENT CLAIMS TO THE GOVERNMENT .......................................... 26

X.   THE IMPROPER USE OF MODIFIER 25 IN BILLING FOR E&M SERVICES IS MATERIAL TO THE GOVERNMENT'S PAYMENT DECISIONS ...................... 29

On behalf of the United States of America ("United States") and the Commonwealth of Massachusetts ("Massachusetts"), Plaintiff-Relator, Joseph Nocie ("Relator"), brings this action to recover for false claims submitted to Medicare and MassHealth, Massachusetts' Medicaid Program, as a result of the conduct of defendants, Steward Health Care System, LLC ("Steward"), Steward Medical Group, Inc. ("SMG"), Steward St. Elizabeth's Medical Center of Boston ("SEMC") and Steward Carney Hospital, Inc. ("Carney") (collectively "Defendants"), in violation of the federal False Claims Act ("the FCA"), 31 U.S.C. § 3729, *et seq.*, and the Massachusetts Whistleblower Law:  The False Claims Act ("the Massachusetts FCA"), Ch.12 § 5A, *et seq.*  Relator brings this action to recover all damages, civil penalties and all other recoveries provided for under the FCA and the Massachusetts FCA.

## I.   NATURE OF ACTION

1.   Beginning prior to 2016 and continuing through the present, Defendants have submitted or caused to be submitted thousands of false claims for evaluation and management ("E&M") services to Medicare and MassHealth for reimbursement.

2.   In brief, E&M services are when a physician or other provider is either evaluating or managing a patient's health.  E&M services can include taking a patient's medical history, performing a physical examination of the patient and/or making a medical decision as to the patient's treatment.

3.   This action concerns improper claims for E&M services in connection with various minor surgical procedures and diagnostic tests performed at the hospital-based clinics[1] associated

---

[1] All references herein to "hospital-based clinic" or "clinic" are meant to also encompass outpatient departments associated with Defendants SEMC and Carney that meet the regulatory requirements.  *See* 42 C.F.R. § 413.65 (requirements for determining provider-based clinic status).

1

with Defendants SEMC and Carney, such as the Bone and Joint Clinic, the Otolaryngology Clinic ("the ENT Clinic"), the Adult Medicine Clinic, and the Cardiology and Vascular Medicine Center.

4.     According to Medicare and MassHealth law, rules and regulations, government reimbursement for a minor surgical procedure or diagnostic test encompasses any E&M services associated with that procedure or test.  In other words, when a physician performs a medical procedure or diagnostic test, the reimbursement for the pre- and post-operative care that is necessary for the patient is covered by the payment for the procedure or test itself.

5.     Medicare and MassHealth do not allow billing for a separate E&M service associated with the procedure or test unless certain, specific conditions are met: 1) the E&M service is for a significant, separately identifiable service rather than for the original procedure or test; and 2) it is appropriately and sufficiently documented in the medical record.  If those requirements are met, then the provider may bill for a separate E&M service by adding the billing code "modifier 25" to the E&M service code on the claim form.  The provider will then receive reimbursement not only for the procedure or test, but also for the significant and separately identifiable E&M service.  For example, if a doctor administers a cortisone injection to a patient's knee and then the doctor also treats the patient for a complaint about shoulder pain by examining the patient's shoulder and recommending physical therapy, then billing for E&M services with modifier 25 would be appropriate for treatment of the patient's shoulder.

6.     Contrary to the law, rules and regulations, when billing for a minor surgical procedure or diagnostic test performed at the hospital-based clinics, Defendants also billed -- improperly -- for E&M services using billing code modifier 25 when: 1) a significant and separately identifiable service was ***not*** provided to the patient beyond those associated with procedure or test; or 2) the service was ***not*** appropriately and sufficiently documented in the medical record.

7.      Defendants submitted or caused to be submitted thousands of claims to Medicare and MassHealth throughout the relevant time period.  Relator estimates that at least 50%, and likely a much higher percentage of claims submitted for E&M services with appended modifier 25, were false or fraudulent because they: 1) billed for E&M services that were never provided (to the extent E&M services were provided, they were part and parcel of the procedure or test); 2) improperly appended modifier 25 in billing for E&M services; and/or 3) were not appropriately or sufficiently documented in the patients' medical records.

8.      Defendants knew that their fraudulent conduct would result in the submission of thousands of false or fraudulent claims to Medicare and MassHealth.  Defendants submitted or caused to be submitted these claims with actual knowledge that they were false, or with reckless disregard and/or with deliberate ignorance of their truth or falsity.

9.      In addition, the fraudulent conduct alleged herein is material to the government's reimbursement decisions.  In order to participate in Medicare and MassHealth and receive reimbursement for claims for medical services, the government requires specific certifications that the claims submitted are true, accurate and complete and in compliance with the law, rules and regulations, which at least 50% of the claims described herein were not.

10.     Further, the government has regularly pursued enforcement actions against other companies for similar conduct, including related to improperly billing for E&M services; has made these types of violations a target for Health and Human Services' Office of Inspector General's (OIG's) yearly work plans; and has issued at least one OIG Report detailing its investigation and findings into the misuse of modifier 25 in billing for E&M services.

11.     Here, as a result of Defendants' conduct in violation of Sections 3729(a)(1)(A), (B) of the FCA and Sections 5B(a)(1), (2) of the Massachusetts FCA, the government has suffered millions

3

of dollars in single damages, which, under the FCA and Massachusetts FCA, are subject to trebling. 31 U.S.C. § 3729(a)(1); Mass. Gen. Laws Ann. Ch. 12 §5B(a).

## II.    JURISDICTION AND VENUE

12.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1367(a).

13.    This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants reside and transact business in the District of Massachusetts.

14.    Venue is proper in the District of Massachusetts under 31 U.S.C. § 3732 and 28 U.S.C. § 1391 (b) and (c) because Defendants reside and transact business in this District.

## III.    PROCEDURAL HISTORY

15.    On June 1, 2018, Relator filed an Original Complaint in this action under seal on behalf of the United States and Massachusetts against Defendants Steward, SMG and SEMC alleging violations of the FCA and the Massachusetts FCA.  Dkt. No. 1.

16.    On September 5, 2023, the United States filed a Notice of its Election to Intervene in Part and Decline in Part, intervening as to Counts 1 and 2 of Relator's Original Complaint and declining to intervene with respect to all other allegations.  Dkt. No. 47.  Further, the United States recognized that pursuant to 31 U.S.C. § 3730(b)(1), Relator may litigate on his own the declined portion of the action in the name of the United States.

17.    In addition, Massachusetts has declined to intervene in this action.  However, under the Massachusetts FCA, Relator may maintain the action in the name of the Commonwealth.

18.    On December 15, 2023, the United States filed a Complaint-in-Intervention setting forth allegations of excessive physician compensation paid to one physician in violation of the Stark Act, the FCA, and common law.  Dkt. No. 52.

19.     Relator, on behalf of the United States and Massachusetts, now files this Amended Complaint against Defendants for overbilling Medicare and MassHealth for E&M services purportedly provided at the hospital-based clinics associated with Defendants SEMC and Carney. Pursuant to the Section 3730(b)(1) of the FCA and Section 5D(6) of the Massachusetts FCA, Relator may litigate FCA claims on his own, on behalf of the government, once the government declines to intervene.

20.     Relator's Amended Complaint relates back to the date of his Original Complaint under Rule 15(c)(1)(B) of the Federal Rules of Civil Procedure which provides: "An amendment of a pleading relates back to the date of the original pleading when . . . the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set out -- or attempted to be set out -- in the original pleading . . . ."  The allegations in this Amended Complaint about overbilling Medicare and MassHealth "arose out of the conduct, transaction, or occurrence set out -- or attempted to be set out -- in the [Original Complaint] . . . ." including, without limitation, paragraphs 143-148 of Relator's Original Complaint.

21.     Contemporaneously herewith, Relator is filing a Notice of Partial Voluntary Dismissal Pursuant to F.R.C.P. 41(a)(1)(A)(i) as to the allegations and claims from Relator's Original Complaint as to which the United States and Massachusetts declined to intervene, and Relator is not litigating further on his own and, therefore, is dismissing.

## IV.    PARTIES

22.     The United States is a Plaintiff in this action on behalf of the Department of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS"), which administers the Medicare Program, 42 U.S.C. §§ 1395 *et seq.* (Medicare"), and the Medicaid Program, 42 U.S.C. §§ 1396 *et seq.* ("Medicaid").

23.     The Commonwealth of Massachusetts is a Plaintiff in this action on behalf of the Executive Office of Health and Human Services which administers its Medicaid Program, known as MassHealth.

24.     Plaintiff-Relator, Joseph Nocie ("Relator"), is a United States citizen and resident of Sacramento, CA.  Relator was the Chief Financial Officer of SEMC from approximately May 2016 through November 2017.  He was employed by Steward and worked for SEMC in Massachusetts.

25.     Defendant Steward Health Care System, LLC ("Steward") is one of the largest for-profit, private hospital operators in the United States.  Steward wholly owns SMG, SEMC and Carney.  Steward, SMG, SEMC and Carney all have the same Principal Office at 1900 N. Pearl Street, Suite 2400, Dallas, TX 75201.

26.     Defendant Steward Medical Group, Inc. ("SMG") is a Delaware corporation with a principal office in Dallas, Texas.  SMG employs physicians that provide medical services to patients, including at the hospital-based clinics associated with Defendants SEMC and Carney.  SMG receives all professional fee reimbursements made by Medicare and MassHealth for services provided at the hospital-based clinics.  Steward owns and operates SMG.

27.     Defendant Steward St. Elizabeth's Medical Center of Boston ("SEMC") is a hospital in Brighton, Massachusetts.  Steward owns and operates SEMC.  SEMC is a Delaware corporation with an office in Boston.  SEMC provides hospital services at 736 Cambridge St., Brighton, MA 02135.  SEMC has a number of hospital-based clinics.  SEMC holds and retains all facility fee reimbursements by Medicare and MassHealth for services provided by the hospital and the hospital-based clinics.

28.     Defendant Steward Carney Hospital, Inc. ("Carney") is a hospital in Dorchester, Massachusetts.  Steward owns and operates Carney.  Carney is a Delaware corporation with its

principal office in Dallas, Texas.  Carney provides hospital services at 2100 Dorchester Ave,

Dorchester, MA 02124.  Carney has a number of hospital-based clinics.  Carney holds and retains all

facility fee reimbursements by Medicare and MassHealth for services provided at the hospital and

the hospital-based clinics.

## V.     THE FEDERAL FALSE CLAIMS ACT AND MASSACHUSETTS FALSE CLAIMS ACT

29.     The Federal FCA provides, among other things, that any person who (1) "knowingly

presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2)

"knowingly makes, uses, or causes to be made or used, a false record or statement material to a false

or fraudulent claim" is liable to the United States for a civil monetary penalty plus treble damages.

31 U.S.C. § 3729(a)(1)(A)-(B).  In other words, the required elements to prove in order to establish a

violation of the Federal FCA are falsity, materiality, causation and scienter/knowledge.

30.     The relevant terms are defined as follows.  The term "knowingly" means "that a

person, with respect to information (1) has actual knowledge of the information; (2) acts in

deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the

truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii).  Proof of specific intent to

defraud is not required. 31 U.S.C. § 3729(b)(1)(B).

31.     The term "claim" means "any request or demand, whether under a contract or

otherwise, for money or property and whether or not the United States has title to the money or

property, …." 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

32.     "[T]he term 'material' means having a natural tendency to influence, or be capable of

influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

33.     Like the Federal FCA, the Massachusetts Whistleblower Law: The False Claims Act,

Mass. Gen. Laws Ann. Ch. 12 § 5 *et seq.* ("the Massachusetts FCA") provides for civil monetary

penalties and treble damages.  Further, the liability provisions of the Massachusetts FCA are

materially identical to the provisions under the Federal FCA set forth above.

## VI.    BACKGROUND REGARDING MEDICARE AND MEDICAID

### A.    <u>The Medicare Program</u>

34.    In 1965, Congress enacted Title XVIII of the Social Security Act, known as the

Medicare Program, to pay for the cost of healthcare services for certain individuals.  Medicare

proves benefits to persons who are over the age of 65, disabled or suffering from end-stage renal

disease.  See 42 U.S.C. §§ 426, 426A.

35.    Medicare is administered by the Centers for Medicare & Medicaid Services ("CMS"),

a federal agency within the Department of Health and Human Services ("HHS").

36.    The Medicare Program includes various "Parts," which refer to the type of service or

item covered.  Medicare Part B is relevant to the false claims alleged in this action.  Part B primarily

covers reimbursement for physician services, diagnostic tests and outpatient surgeries.  *See* 42

U.S.C. § 1395k.

37.    CMS utilizes Medicare Administrative Contractors ("MACs") to administer Medicare

in accordance with CMS rules.  The MACs generally act on behalf of CMS to process and pay

claims and perform administrative functions on a regional level.  *See* 42 C.F.R. § 421.5.[2]  In

Massachusetts, the MAC is National Government Services, Inc.

38.    Given that it is neither realistic nor feasible for MACs (or CMS for that matter) to

review a patient's medical record and other documentation before paying a claim, payment is

generally made under Medicare in reliance upon the provider's enrollment obligations certifying

compliance with all Medicare laws, regulations and program instructions as well as certifications on

---

[2] All references to CMS, Medicare or the government herein are meant to encompass MACs.

8

Medicare claim forms and cost reports.  In other words, Medicare is essentially a "trust-based" system.

39.     As a result, certifications on Medicare enrollment forms and claim submissions play an important role in ensuring the integrity of the Medicare Program.

B.     **The Medicaid Program:  MassHealth**

40.     Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the indigent and disabled.  The federal involvement in Medicaid is largely limited to providing matching funds and ensuring that states comply with minimum standards in the administration of the program.

41.     The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation. 42 U.S.C. §§ 1396 *et seq.*

42.     In order to qualify for federal financial participation, each state's Medicaid program must meet certain minimum requirements, including the provision of hospital services to Medicaid beneficiaries. 42 U.S.C. § 1396a(a)(10)(A), 42 U.S.C. § 1396d(a)(1) – (2).

43.     As relevant here, in Massachusetts, the Medicaid Program, "MassHealth," provides health benefits to qualifying children, adults and people with disabilities living in Massachusetts. MassHealth offers Medicaid benefits to members on a Fee-for-Service ("FFS") basis or through managed care organizations.

44.     "Under the FFS model, MassHealth pays providers directly for each covered service received by an eligible MassHealth member." https://www.mass.gov/info-details/fee-for-service-ffs-and-masshealth-provider-network (last visited on Dec. 4, 2023).

45.     With Managed care organizations ("MCOs"), MassHealth reimburses the MCOs which "are health plans run by health insurance companies that provide care through their own

9

provider network that includes PCPs, specialists, behavioral health providers, and hospitals."

https://www.mass.gov/info-details/managed-care-organizations-and-accountable-care-partnership-plans#managed-care-organizations-(mcos)- (last visited on Dec. 4, 2023).[3]

**C.      Medicare and MassHealth Enrollment by Providers and Hospitals**

46.      Hospitals who wish to be eligible to participate in Medicare, provide health care to Medicare beneficiaries and receive reimbursement from CMS must periodically sign an enrollment application.  The Medicare Enrollment Application (Form CMS-855A) must be signed by an authorized representative of the hospital and contains a statement certifying compliance with certain federal requirements.  Among other things, the hospital must certify to the following:

> I agree to abide by the Medicare laws, regulations and programs
> instructions that apply to this provider…. I understand that
> payment of a claim by Medicare is conditioned upon the claim and
> the underlying transaction complying with such laws, regulations,
> and program instructions (including but not limited to, the Federal
> anti-kickback statute and the Stark law), and on the provider's
> compliance with all applicable conditions of participation in
> Medicare.

*See* CMS-855A, § 15(A)(3), *available at* https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms855a.pdf

47.      Similarly, MassHealth providers must enroll in MassHealth by signing a provider agreement in order to participate in MassHealth, furnish medical services to MassHealth members and receive reimbursement from MassHealth.  https://www.mass.gov/info-details/fee-for-service-ffs-and-masshealth-provider-network (last visited on Dec. 4, 2023).

---

[3] References herein to MassHealth are meant to encompass, where applicable, MCOs acting on behalf of MassHealth.

## VII.    MEDICARE AND MASSHEALTH BILLING LAWS, RULES & REGULATIONS

### A.    <u>Medicare and Medicaid Reimbursement</u>

48.    Medicare and Medicaid provide coverage or reimbursement only for services that are medically necessary to diagnose and treat illness or injury, and for which the provider maintains adequate supporting documentation corroborating the treatment administered and for which reimbursement is sought.  42 U.S.C. § 1395y(a)(1)(A), 1395l(e); 42 C.F.R. § 411.15(k)(1).

49.    In other words, Medicare and Medicaid do not cover claims for services provided that are not necessary, not administered, or not documented.

### B.    <u>Claims Submitted to Medicare and MassHealth for Reimbursement Certify Compliance with the Law, Rules and Regulations</u>

50.    As relevant to this action, when a Medicare beneficiary or MassHealth member sees a provider at one of the hospital-based clinics, (at least) two claims are generated and submitted to the government for reimbursement:  the facility fee claim and the professional fee claim, as discussed more fully below.

51.    As alleged herein, Defendants submitted or caused to be submitted both false facility fee claims as well as false professional fee claims to the government for reimbursement by improperly billing for E&M services using modifier 25.

52.    Both facility fee and professional fee claims include certain certifications as to compliance with the law, rules and regulations.  These certifications are expressly stated on the claim forms themselves.  *See* Ex. A (sample CMS Form UB-04 for facility fee claims) and Ex. B (sample CMS Form 1500 for professional fee claims).  By submitting the claim forms to the government for reimbursement, the submitter is expressly certifying compliance with the certifications contained therein.

1.      **Facility Fee Claim**

53.     On the facility fee claim, the clinic may bill the government for reimbursement of its facility fees which include the clinic's costs for supplies, overhead, as well as services provided by clinical staff.

54.     The claims may be submitted using CMS Form UB-04 for paper claims and for electronic claims, 837 I (Institutional) is the standard electronic format used to send claims electronically to the government.  Medicare Claims Processing Manual, Ch. 4 – Part B Hospital (Including Inpatient Hospital Part B and OPPS), §10.1; Ch. 25 – Completing and Processing the Form CMS-1450 (aka Form UB-04) Data Set, §70.1.

55.     The facility fee claim (submitted on CMS Form UB-04 or for electronic claims, 837 I (Institutional)) includes the following certification:

> THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S).

56.     Further, the facility fee claim includes the following certification that the information submitted is true, accurate and complete:

> Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete.  That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts.

57.     Also, the claim contains a certification specific to Medicaid certifying that the submitter understands that the Medicaid reimbursements are made from Federal and State funds (as Medicaid is a jointly-funded program) and that any false statements are punishable under the law:

> 8.  For Medicaid purposes:  The submitter understands that because payment and satisfaction of this claim will be from

> Federal and State funds, any false statements, documents, or
> concealment of a material fact are subject to prosecution under
> applicable Federal and or State Laws.

58.     Medicare reimburses facility fee claims based on the Outpatient Prospective Payment System.  Medicare Claims Processing Manual, Ch. 4 – Part B Hospital (Including Inpatient Hospital Part B and OPPS), §10.1.

### 2.     Professional Fee Claim

59.     On the professional fee claim, the provider may bill the government for reimbursement for physician services, diagnostic tests and outpatient surgeries.

60.     The claims may be submitted using CMS Form 1500 for paper claims and for electronic claims, 837 P (Professional) is the standard electronic format used to send claims electronically to the government.  Medicare Claims Processing Manual, Ch. 26 – Completing and Processing the Form CMS-1500 Data Set, §10.

61.     With regard to the professional fee claims (submitted on CMS Form 1500, or for electronic claims, 837 P (Professional)), they include an acknowledgement that "[a]ny person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

62.     Further, the professional fee claim acknowledges that payment of the claim will be made from federal funds and includes the following certification:

> I certify that: 1) the information on this form is true, accurate and
> complete; 2) I have familiarized myself with all applicable laws,
> regulations, and program instructions, which are available from the
> Medicare contractor; 3) I have provided or will provide sufficient
> information required to allow the government to make an informed
> eligibility and payment decision; 4) this claim, whether submitted
> by me or on my behalf by my designated billing company,
> complies with all applicable Medicare and/or Medicaid laws,

13

regulations, and program instructions for payment . . .; 5) the
services on this form were medically necessary . . . .

63.     Additionally, for Medicaid payments the professional fee claim includes the

following specific certification:

> I hereby agree to keep such records as are necessary to disclose
> fully the extent of services provided to individuals under the
> State's Title XIX plan and to furnish information regarding any
> payments claimed for providing such services as the State Agency
> or Dept. of Health and Human Services may request.
>
> ***
>
> I certify that the services listed above were medically indicated and
> necessary to the health of this patient . . . .
>
> ***
>
> NOTICE:  This is to certify that the foregoing information is true,
> accurate and complete.  I understand that payment of this claim
> will be from Federal and State funds, and that any false claims,
> statements, or documents, or concealment of a material fact, may
> be prosecuted under applicable Federal or State laws.

64.     Medicare reimburses professional fee claims based on the Medicare Physician Fee

Schedule.  Medicare Claims Processing Manual, Ch. 12 – Physicians/Nonphysician Practitioners,

§20.

**C.     Billing Medicare for E&M Services, Minor Surgical Procedures and Diagnostic Tests**

65.     Simply put, evaluation and management services are performed by a physician or

other provider "in which the provider is either evaluating or managing a patient's health."  AMA,

Evaluation and Management (E/M) Coding, https://www.ama-assn.org/topics/evaluation-and-

management-em-coding (last visited on Dec. 8, 2023).  E&M services can include taking a patient's

medical history, performing a physical examination of the patient and making medical decisions as

to treatment.

14

66.     E&M services are billed using, *inter alia*, Current Procedural Terminology ("CPT") codes within the range of 92002-92014, 99201- 99499 [4] or Healthcare Common Procedure Coding System (HCPCS) code G0463.  *Id.*

67.     Procedures such as diagnostic tests, minor surgical procedures and other therapies are not considered E&M services and are billed separately using their own relevant CPT codes.  *Id.*

68.     Some examples of diagnostic tests and minor surgical procedures performed at the clinics relevant to this action include: injections of tendon sheath, ligament, or muscle membrane billed under CPT code 20550; aspiration and/or injection of medium joint or joint capsule billed under CPT code 20605; diagnostic exam of nasal passages using an endoscope billed under CPT code 31231; and removal of impacted ear wax, one ear billed under CPT code 69210.

69.     The billing and reimbursement for minor surgical procedures and diagnostic tests include any E&M services associated with the procedure such as pre- and post-procedure care, including a physical examination of the patient and medical decision-making related to deciding to perform the procedure.  These elements are covered by and included in the CPT code billing for the procedure or test.  Thus, billing and reimbursement for E&M services, in addition to billing for the procedure or test performed on the same day, will be denied.  *See* CMS, Medicare Learning Network Matters Article #MM5025, Payment for Evaluation and Management Services Provided During Global Period of Surgery (May 24, 2006) at p. 2.

70.     However, Medicare does allow billing and reimbursement for separate E&M services, in addition to billing for the minor surgical procedure or test, if certain requirements are met:

---

[4] CPT codes for E&M services provided in the Emergency Room setting (CPT codes 99281-99288) are not relevant to this action.

- The E&M service "is for a significant, separately identifiable E&M service that is above and beyond the usual pre- and post-operative work of the procedure."

- "Both the medically necessary E/M service and the procedure must be appropriately and sufficiently documented by the physician . . . in the patient's medical record to support the claim for these services . . . ."

*See* Medicare Claims Processing Manual, Ch. 12 – Physicians/Nonphysician Practitioners §§ 30.6.6, 40.2.8; *see also* Medicare Claims Processing Manual, Ch. 4 – Part B Hospital (Including Inpatient Hospital Part B and OPPS), § 20.6; Medicare National Correct Coding Initiative Policy Manual, Ch. 1, § E.b.; CMS, Medicare Learning Network Matters Article #MM5025, Payment for Evaluation and Management Services Provided During Global Period of Surgery (May 24, 2006).

71.    If the E&M service is for a significant, separately identifiable E&M service from the procedure or test provided on the same day, and there is appropriate and sufficient documentation in the medical record, then the CPT code modifier 25 may be appended to the E&M service code. *Id.* This will lead to increased reimbursement by Medicare as it will reimburse not only for the procedure, but also pay for the separate E&M service.

72.    For example, a Department of Health and Human Services Program Memorandum gives an example of the proper use of modifier 25 in billing Medicare:

> *Example:* A patient reports for pulmonary function testing in the morning and then attends the hypertension clinic in the afternoon.
>
> The pulmonary function tests are reported without an E/M service code. However, an E/M service code with the modifier -25 appended may be reported to indicate that the afternoon hypertension clinic visit was not related to the pulmonary function testing.

DHHS, HCFA, Program Memorandum, Transmittal A-00-40, Subject: Further Information on the Use of Modifier -25 in Reporting Hospital Outpatient Services dated July 20, 2000.

### D.  Billing MassHealth for E&M Services, Minor Surgical Procedures and Diagnostic Tests

73.     The law, rules and regulations regarding billing MassHealth for E&M services, minor surgical procedures and diagnostic tests, including the appropriate use of modifier 25, are consistent with Medicare.  *See* MassHealth, All Provider Bulletin 227, Modifier Coverage and National Correct Coding Initiative (NCCI) Updates dated June 2012.

74.     MassHealth notes that modifier 25 is an "allowable modifier" but must only be appended to an E&M CPT code if the E&M service "is significant and separately identifiable from other procedures/services reported on the same date."  *Id.*

75.     Further, MassHealth states that "[a]s defined by CMS, modifiers indicated special circumstances that allow providers to bill code pairs that are otherwise denied when billed together. . . . Providers must ensure that documentation in the patient's records is sufficient to support the use of a modifier upon review by MassHealth."  *Id.* at p. 4.

## VIII.  DEFENDANTS KNOWINGLY SUBMITTED OR CAUSED THE SUBMISSION OF FALSE CLAIMS TO MEDICARE AND MASSHEALTH BY BILLING FOR EVALUATION & MANAGEMENT SERVICES THAT WERE NOT PROVIDED OR WERE NOT APPROPRIATELY AND SUFFICIENTLY DOCUMENTED

76.     For thousands of claims submitted to Medicare and MassHealth, Defendants knowingly overbilled (or caused overbilling) for E&M services that were not provided to patients (for a significant, separately identifiable E&M service that was above and beyond the E&M services provided for the procedure or test) or were not appropriately and sufficiently documented in the patients' medical records.  Defendants did this through the improper use of billing code modifier 25.

77.     As set forth above, Medicare and MassHealth will only reimburse for an E&M service, in addition to reimbursing for a minor surgical procedure or diagnostic test, if: 1) the E&M

service is for a significant, separately identifiable service that is above and beyond the usual pre- and post-operative work related to the procedure; and 2) is appropriately and sufficiently documented in the medical record.  This is because when a physician performs a medical procedure or test, the reimbursement for the pre- and post-operative care that is necessary for the patient is covered by the payment for the procedure or test itself.  However, in those instances where E&M services are necessary due to a significant, separately identifiable problem with the patient, the E&M service may be billed with modifier 25 for increased reimbursement.

78.     As alleged in Subsection A below, modifier 25 was automatically linked to certain E&M service codes in Defendants' billing system.  Defendants were aware that this automatic linking presented overbilling risks, but thought that they could address those risks through educating the billing staff and instituting policies and procedures on the correct use of modifier 25.  However, as alleged in Subsection B below, Defendants failed to implement any of those safeguarding measures.

79.     Moreover, as alleged in Subsections C-E below, in 2017, outside auditors raised the compliance risks associated with modifier 25, yet Defendants did not change their practices and also dismissed Relator's attempts to escalate the issue to the Compliance Department.

80.     Defendants' conduct has led to routine and consistent overbilling from at least 2016 through the present (as alleged in Subsection F below).  For example, for 2016 and January through October of 2017, Defendants' clinics appended modifier 25 thousands of times to the E&M charges in order to receive increased reimbursement, as set forth in this chart:

| Clinic/Department | 2016 Modifier 25 Usage Per Patient Account | Jan.- Oct. 2017 Modifier 25 Usage Per Patient Account |
|---|---|---|
| Adult Medicine | 4738 | 3269 |
| Vascular Lab | 2656 | 2488 |
| Cardiology Clinic | 2565 | 2380 |
| ENT | 2155 | 2415 |
| Bone & Joint Clinic | 1292 | 1430 |

Although it is possible that some of these E&M charges were proper, Defendants failed to do any sort of investigation or review of the medical records or billing to determine if that was the case. Relator estimates that **_at least 50%_** were improper or fraudulent charges based on, _inter alia_, his role as CFO of SEMC, including communications with his colleagues, participation in meetings and on committees, and review of documents and information; his substantial involvement in the audit that raised a compliance risk associated with modifier 25; and his inclusion in the audit follow-up.

### A.   Defendants Were Aware of the Overbilling Risk Associated with the Use of Modifier 25 in Billing for E&M Services

81.    Defendants were aware that modifier 25 was automatically linked to certain E&M codes and that this presented an overbilling risk as the E&M services could then be billed without any analysis of whether there was a significant, separately identifiable problem requiring E&M services (beyond those provided as part of the minor surgical procedure or diagnostic test). Defendants' billing system automatically linked modifier 25 to certain E&M billing codes.

82.    By way of background, a Charge Description Master ("CDM") is a database or table listing all possible individual items and services to be provided to a patient for which the hospital has established a charge, such as CPT/HCPCS codes, descriptions, revenue codes, department information, etc.  _See_ 42 C.F.R. § 180.20.  The CDM is essentially a list of all billable items for a patient's clinic visit (or hospital stay).

83.     The CDM is loaded into Defendants' billing system.  In the billing system, modifier 25 was hard-coded as an option for billing certain E&M codes.  In other words, modifier 25 was automatically linked to certain E&M codes.

84.     When the individual handling the billing for the patient's clinic visit (*i.e.,* the untrained clerical staff, as alleged below) included certain billing codes (*i.e.,* a procedure/test code and an E&M code), the modifier 25 would be automatically linked in the billing system.  This billing system generated claims to Medicare and MassHealth.

85.     Defendant Steward's Health Information Management (HIM) and Compliance Departments decided to allow the modifier 25 to be hard-coded or automatically linked, but only if the department or clinic was educated or trained on proper modifier 25 usage and had policies in place regarding when it could be used.  However, as alleged below, Defendants failed to follow through and institute uniform policies and procedures or provide education on the proper use of modifier 25, leading to consistent overbilling for E&M services at the hospital-based clinics.

**B.     Defendants Did Not Have Uniform Policies and Procedures Or Guidelines On The Correct Use Of Modifier 25 In Billing for E&M Services Nor Did They Provide Training to the Clerical Staff Handling the Billing**

86.     Defendants failed to develop uniform policies and procedures or guidelines for the clinics setting forth how to properly use the modifier 25 when billing for E&M services.

87.     Not only did the clinics lack any clear guidelines, they relied on clerical staff, including sometimes administrative assistants, to perform the coding and billing at the clinics.  These employees were not trained coders or other billing personnel, nor had they received any specialized training in the correct use of modifier 25 in billing for E&M services.

88.     Defendant Steward's management, including the Director of HIM, Maxine Thomas-Smith, was aware that the untrained clerical staff performed the coding and billing at the various clinics.

89.     Furthermore, the claims for the most part were *not* sent to the Medical Record review team to be reviewed by certified coders, unless they somehow failed to include modifier 25, as discussed more fully in Subsection E below.

C.     **Auditors in 2017 Alerted Defendants that Their Use of Modifier 25 Presented a Compliance Risk**

90.     In and around April 2017, Defendant Steward hired auditors, a company called Craneware, to do an analysis of its hospital billing.  At the time, Steward owned eight acute care hospitals in Massachusetts, including SEMC and Carney.  Craneware was specifically engaged to assess the individual Charge Description Masters ("CDMs") for the hospitals.

91.     Relator was substantially involved in working with Craneware helping to coordinate the audit as well as reviewing the auditor's findings at the completion of the audit.  Initially, Relator and Jason Levine, Director of Finance at SEMC, discussed with Craneware the scope of their audit/review at SEMC.  Craneware asked them to schedule meetings with each of the clinic and department leaders and the individuals responsible for entering billing charges, and they encouraged them to attend those meetings as well. Relator or Mr. Levine attended all of the scheduled meetings.

92.     As a result of the audit, Craneware issued written reports, *inter alia*, a Steward Health Care CDM Review Final Report, a SEMC CDM Review and an action plan.  Craneware submitted its audit reports to Steward's centralized business department, specifically to the Senior Vice President of Revenue Operations, Neville Zar.  The audit reports were later shared with the CFOs of all the hospitals, including Relator, CFO of SEMC.

93.     In its Steward Health Care CDM Review Final Report dated June 9, 2017, Craneware emphasized the importance of maintaining an accurate CDM for ensuring hospital revenue:

> A current and accurate chargemaster is vital to any healthcare
> provider seeking proper reimbursement and is a key indicator in a
> healthy revenue cycle.  The CDM allows the organization to
> capture charges as they occur, almost in real time.  Without a

21

> healthy CDM process, the facility would not receive proper reimbursement, and incoming revenue could potentially come to a halt.

*Id.* at p. 3 (quoting the American Health Information Management Association).

94.     In addition, Craneware emphasized that overbilling may occur if the CDM is not accurate:  "Among the negative effects that may result from an inaccurate chargemaster are: [among other things,] overpayment or overcharging."  *Id.*

95.     Further and significantly, Craneware warned that "[b]ecause a chargemaster is an automated process that results in billing numerous services for high volumes of patients—often without human intervention—there is a high risk that a single coding or mapping error could spawn error after error before it is identified and corrected."  *Id.*

96.     Craneware in its report did generally note that there were certain "hard-coded modifiers on CPT/HCPCS codes within the CDM where the appended modifier is at a variance with the published guidance from CMS" and that "[f]ew charge lines had . . . hard-coded modifiers [including modifier -25] that directly change the CPT/HCPCS payment."  *Id.* at 22.

97.     However, Craneware, like most auditing agencies, refrains from putting compliance issues in writing.  Instead, they usually communicate those findings via phone calls, face-to- face meetings and sometimes email.  Consistent with this approach, Craneware verbally conveyed to Defendants that there may be an issue with clinics consistently overusing modifier 25 because it was automatically linked to certain E&M service codes.  In other words, when the clinic personnel entering the billing codes for the patient's office visit included a procedure code and an E&M code, the modifier 25 would be automatically added to the claim.  This was an automated process as the modifier 25 was linked behind the scenes.  Relator learned of this issue during a phone call with Craneware.

98.     As a follow-up, Craneware supplied Steward with the number of E&M service codes where the modifier 25 was linked.  The business office of Defendant SMG then ran a list of all patient accounts that had been billed these codes and generated a list, by clinic, of how many times these hard-coded charges had occurred during a particular period.  They found, for example, that during the period reviewed, the Bone and Joint Clinic billed the hard-coded modifier 25 a total of 1,195 times; Adult Medicine 3,610 times; the Vascular Lab 2,868 times; the Cardiology and Vascular Medicine Center 2,585 times, and the ENT Clinic 2,103 times. Although it is possible that some of these charges were proper, and in fact the government should have been charged for significant, separately identifiable E&M services, Defendants failed to do any sort of investigation or review of the medical records or billing to determine if that were the case and Relator estimates that over half were improperly billed.

99.     In addition, Defendants were aware that the clinics lacked guidelines as noted in the Steward CDM Review Action Plan compiled by Craneware along with the Steward Revenue Integrity team after the audit.  One of the items on the Action Plan noted that all provider-based clinics and departments lacked guidelines for billing E&M and that HIM should work with the clinics in developing those guidelines.

### D.     **Defendant Steward Kept Their Compliance Department in the Dark but Relator Attempted to Escalate the Issue (Unsuccessfully)**

100.    In response to the Craneware audit, Neville Zar (Steward's SVP, Revenue Operations) and Rich Iannessa (Steward's VP, Revenue Operations) instructed Michele Skinner (Steward's Executive Director of Health Information Management (HIM)) to ***not*** share the findings with the Compliance Department.

101.     Instead, they asked her to merely reach out to all of the clinics with the linked modifier 25 to see if they had written guidelines on the appropriate use of the modifier and written procedures to instruct the staff on how to use it appropriately.

102.     On September 20, 2017, Ms. Skinner emailed the hospital-based clinic managers (Relator was copied on the email).  In response, many of the managers had no understanding of the proper billing use of modifier 25 or any knowledge that it was linked to some of the charges for their departments, nor did they have guidelines for its proper use.

103.     However, in approximately October 2017, Relator raised the issue of the misuse of modifier 25 with Compliance (Liz Gifford) during their Compliance Items Review Meeting.  Per Relator's request, Ms. Gifford then reported the findings to her superior, Karen Murray, VP, Chief Compliance Officer at Steward, on or around November 14, 2017.  Ms. Gifford subsequently told Relator that Ms. Murray said that she had looked into the issue and raised it with leadership, but leadership said that there was no concern.

104.     Further, via email on November 15, 2017, Relator asked Craneware's Vice President of Client Services, Elaine Dunn, whether the improper hard-coded charges were removed or reversed, and she responded that they had **not** been removed and admitted that "in **an ideal situation** you would **not** want these hard-coded [in the CDM] . . . ."  (emphasis added).

**E.     Defendants Failed to Review for Accuracy Claims with Modifier 25 Appended, only Reviewed Claims _Without_ Modifier 25**

105.     In and around 2016-2017 and, upon information and belief continuing thereafter, Defendant Steward's Revenue Operations group held monthly meetings with each of the hospitals, including Defendants SEMC and Carney. Parson Hicks, Senior Manager of Revenue Operations, and Keely Boyer, Executive Director of Revenue Operations, took turns running these monthly meetings at each of the hospitals.  At Defendant SEMC, Relator along with Christopher Holmes,

24

Revenue Coordinator for SEMC, Kelly Schiffer, Director of Billing at Steward, Christine Dupont, Director of Billing at Steward, and Maxine Thomas Smith, Director of Health Information Management at SEMC would routinely attend the meetings.

106.    The purpose of the meetings was to go over the revenue cycle metrics for the prior month (*e.g.,* claim denials, missing charges, late charges) and review any improvements to, or lessons learned, in revenue cycle operations in order to maximize the hospital's billing and revenues. At these meetings, mention was made as to how many patient accounts *without* a modifier 25 appended to the billing charges would later be assigned a modifier 25 after being reviewed by HIM prior to month end.  In order to potentially increase the hospital's reimbursement, the accounts without a modifier 25 added were sent to the Medical Records coders to review the patient's medical record to determine if the addition of the modifier 25 code would be appropriate.  Notably, the patient accounts with the modifier 25 already added were not sent to the Medical Record coders for review. If the Medical Record coders had reviewed these accounts they would have determined upon review that the physician documentation in many instances did not support the use of modifier 25 and that utilizing the modifier would lead to overbilling the government (and other payers).

107.    While Defendants spent time and resources reviewing the billing that did not include modifier 25 to see if it could be added to enhance reimbursement, Defendants failed to review accounts *with* the modifier 25 already appended to see if it was properly billed.  Defendants only conducted a one-way review in identifying codes to add, but failed to look "both ways" in identifying codes to *delete*, even though they knew their obligation to submit true and accurate claims.

F.    **Defendants Have Not Changed Their Fraudulent Practices**

108.    After the audit in 2017, Defendants intended only to fix the modifier 25 issue going forward, but not to investigate any past overbillings or pay back any reimbursement to the

government.  Although this was Defendants' stated plan, Defendants have failed to change its practices related to the improper use of modifier 25 and continue to overbill for E&M services at its clinics.

## IX.     DEFENDANTS SUBMITTED OR CAUSED TO BE SUBMITTED FALSE AND FRAUDULENT CLAIMS TO THE GOVERNMENT

109.     Throughout the Relevant Time Period, Defendants submitted or caused to be submitted false claims to Medicare and MassHealth.

110.     As alleged above, untrained clerical staff at the clinics, without any clear guidelines to follow, handled the billing that led to the submission of claims.

111.     For each Medicare and MassHealth patient encounter, at least two claims were submitted for reimbursement:  a facility fee claim and a professional fee claim.  Defendants SEMC and Carney retained all facility fee reimbursements by Medicare and MassHealth for services provided at the hospital-based clinics.  Defendant SMG received all professional fee reimbursements made by Medicare and MassHealth for services provided at the clinics.

112.      Defendant Steward owned, operated and oversaw Defendants SMG, SEMC and Carney and as alleged in Section VIII, was aware of the fraudulent overbilling.

113.     The claims submitted to the government for reimbursement were factually false and fraudulent because on the face of the claims, they billed for E&M services that were never provided to the patients.

114.     Further, the claims submitted were legally false as Defendants had expressly and implied certified that they would comply with the law, rules and regulations when in fact the claims were in violation of the Medicare and MassHealth law, rules and regulations in that they: 1) billed for E&M services that were never provided; 2) improperly appended modifier 25 in billing for E&M

services; and/or 3) were not appropriately or sufficiently documented in the patients' medical records.

115.    Relator's conservative estimate that at least 50% of the claims submitted by Defendants' clinics were false or fraudulent is based on his knowledge gained through, *inter alia*:

- His role as CFO of SEMC including his communications with his colleagues, review of documents and information, and his participation on committees and in meetings, including the Revenue Operations group meetings at which it was discussed that patient accounts without a modifier 25 appended would be sent to Medical Record coders for review, but those with a modifier 25 already appended were not sent for review;

- His substantial involvement with the Craneware audit, including communications with Craneware about the modifier 25 compliance risk; and

- His inclusion in the audit follow-up, including with the clinics regarding guidelines for the proper use of modifier 25.

116.    The chart below lists examples of eleven false claims submitted to the government for reimbursement, including the following information for each: 1) the location of the patient's clinic visit 2) the date of the visit; 3) the patient's initials and their government health care insurance (*i.e.,* Medicare, MassHealth Fee for Service or MassHealth Managed Care); 4) the E&M service CPT code improperly billed; 5) the CPT code for the procedure billed and a description of the procedure; 6) the name of the provider (if available); and 7) the specific amount reimbursed by the government (if available).  These claims do not represent the total universe of all of the false claims submitted as a result of the allegations herein, but merely provide representative examples.

117.    The chart lists some representative examples of specific false claims submitted to Medicare and MassHealth as a result of Defendants' conduct as alleged herein:

| Location of Service | Date of Service | Government Insurance | Patient Initials | E&M Service Code | CPT Code | CPT Code Description | Provider | Government Reimbursement |
|---|---|---|---|---|---|---|---|---|
| Steward Carney Hospital, Orthopedic Clinic | 5/23/2017 | Medicare | A.F.H. | G0463-25 | 20610 | Aspiration and/or injection of large joint or joint capsule; without ultrasound | Heller, David | $315.91 |
| Steward Carney Hospital, Orthopedic Clinic | 5/11/2018 | Medicare | A.M.R. | G0463-25 | 20610 | Aspiration and/or injection of large joint or joint capsule; without ultrasound | Muppavarapu, Raghuveer | $445.82 |
| Steward Carney Hospital Clinic | 1/4/2016 | Medicare | M.P.M. | G0463-25 | 85610 | Blood test, clotting time | | $95.16 |
| St. Elizabeth's Medical Center Clinic | 12/30/2020 | Medicare | C.R.H. | G0463-25 | 20550 | Injections of tendon sheath, ligament, or muscle membrane | | $108.70 |
| St. Elizabeth's Medical Center Clinic | 6/20/2019 | Medicare | I.A.B. | G0463-25 | 93925 | Ultrasound study of arteries and arterial grafts of both legs | | $110.14 |
| St. Elizabeth's Medical Center, ENT Clinic | 9/29/2017 | MassHealth FFS | S.Z. | 99213-25 | 31231 | Diagnostic exam of nasal passages using an endoscope | Catalano, Peter | $611.15 |
| Steward Carney Hospital, Orthopedic Clinic | 6/30/2017 | MassHealth FFS | M.B. | G0463-25 | 20610 | Aspiration and/or injection of large joint or joint capsule; without ultrasound | Muppavarapu, Raghuveer | $446.89 |
| Steward Carney Hospital, Orthopedic Clinic | 12/19/2017 | MassHealth FFS | S.O.R. | 99213-25 | 20610 | Aspiration and/or injection of large joint or joint capsule; without ultrasound | Heller, David | $446.89 |
| St. Elizabeth's Medical Center, ENT Clinic | 2/13/2017 | MassHealth Managed Care | B.C.D. | 99212-25 | 31231 | Diagnostic exam of nasal passages using an endoscope | Catalano, Peter | The government reimbursed for the claim. |
| St. Elizabeth's Medical Center, Bone & Joint Clinic | 10/3/2017 | MassHealth Managed Care | A.D.L. | G0463-25 | 20610 | Aspiration and/or injection of large joint or joint capsule; without ultrasound | Agrawal, Kshitjkumar | The government reimbursed for the claim. |
| St. Elizabeth's Medical Center, Bone & Joint Clinic | 7/27/2017 | MassHealth Managed Care | C.C. | 99213-25 | 20550 | Injection; tendon sheath, ligament | Muppavarapu, Raghuveer | The government reimbursed for the claim. |

## X.      THE IMPROPER USE OF MODIFIER 25 IN BILLING FOR E&M SERVICES IS MATERIAL TO THE GOVERNMENT'S PAYMENT DECISIONS

118.    As extensively outlined in Sections VI.C and VII.B. above, the government requires certifications in enrollment applications and expressly on the claims themselves that the claims are true, accurate and complete and in compliance with the law, rules and regulations.

119.    In addition, the government has regularly pursued enforcement actions against other companies for similar overbilling violations including related to improperly billing for E&M services.  Indeed, in 2022, 2021, 2020, 2019 and 2016, the government reached settlements resolving allegations of overbilling for E&M services.[5]

120.    Further, the Office of Inspector General (OIG) of HHS focuses on fighting waste, fraud and abuse and improving the efficiency of Medicaid.  OIG's Work Plan identifies those areas most in need of attention.  Notably, OIG has consistently listed fraud related to billing for E&M services as a target of its investigations, including billing on the same day as a minor surgical procedure and/or the correct use of modifier 25.  *See* OIG Work Plans dated Jan. 2020 – Jan. 2023.

---

[5] HCCA Report on Medicare Compliance, *Hospitals Pay $12.7M in CMP Settlement Over Pain Management Procedures, E/M Services*, Vol. 31, No. 13 (Apr. 11, 2022); *United States, et al., ex rel. John Doe v. Massachusetts Eye and Ear Infirmary, et al.*, 18-cv-10692-GAO (D. Mass. 2021), *Massachusetts Eye and Ear Agrees to Pay $2.6 Million to Resolve False Claims Allegations*, Apr. 20, 2021, available at https://www.justice.gov/usao-ma/pr/massachusetts-eye-and-ear-agrees-pay-26-million-resolve-false-claims-act-allegations (last visited Jan. 3, 2024); *U.S. ex rel. Girling v. Specialist Doctors' Group, LLC*, Case No. 8:17-cv-2647 (M.D. Fla. 2021), Notice of Settlement, Dkt. No. 61; *U.S Settles False Claims Act Allegations Against Southeastern Retina Associates*, Feb. 4, 2020, available at https://www.justice.gov/usao-edtn/pr/u-s-settles-false-claims-act-allegations-against-southeastern-retina-associates (last visited Oct. 31, 2023); *Skyline Urology to Pay $1.85 Million to Settle False Claims Act Allegations of Medicare Overbilling*, Feb. 25, 2019, available at https://www.justice.gov/opa/pr/skyline-urology-pay-185-million-settle-false-claims-act-allegations-medicare-overbilling (last visited Oct. 31, 2023); *Local Physician, Dr. James M. Crumb, and Mobile Based Physician Group, Coastal Neurological Institute, P.C.*, paid $1.4 million to Settle False Claims Act Allegations, June 22, 2017, available at https://www.justice.gov/usao-sdal/pr/local-physician-dr-james-m-crumb-and-mobile-based-physician-group-coastal-neurological (last visited Oct. 31, 2023).

121.    In addition, the OIG Report titled *Use of Modifier 25*, OEI-07-03-00470 (Nov. 2005), details OIG's investigation into the "extent to which use of modifier 25 [met] Medicare program requirements" and concludes that 35% of claims using modifier 25 were fraudulent in that "the E/M services were not significant, separately identifiable, and above and beyond the usual preoperative and postoperative care associated with the procedure, or because the claims failed to meet basic Medicare documentation requirements."  pp. i-ii.  Here, Relator estimates that a greater percentage of claims (at least 50%) using modifier 25 were false or fraudulent because, as alleged above and among other reasons, untrained clerical staff handled the clinic billing, there were no uniform modifier 25 guidelines in place at the clinics, and modifier 25 was automatically linked to certain E&M billing codes in the billing system.

### COUNT I
### FEDERAL FALSE CLAIMS ACT,
### 31 U.S.C. § 3729(a)(1)(A)

122.    Relator incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

123.    Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval for reimbursement for E&M services to the United States.

124.    By virtue of the false or fraudulent claims presented or caused to be presented by Defendants, the United States suffered and is entitled to recover treble damages and a civil penalty for each false claim.

### COUNT II
### FEDERAL FALSE CLAIMS ACT,
### 31 U.S.C. §3729(a)(1)(B)

125.    Relator incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

30

126.    Defendants knowingly made, used, and caused to be made or used, false records or statements material to a false or fraudulent claim to the United States.

127.    By virtue of the false or fraudulent claims presented or caused to be presented by Defendants, the United States suffered and is entitled to recover treble damages and a civil penalty for each false claim.

### COUNT III
### MASSACHUSETTS WHISTLEBLOWER LAW: THE FALSE CLAIMS ACT, MASS. GEN. LAWS ANN. CH. 12 §§ 5B(a)(1)

128.    Relator incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

129.    Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval for reimbursement to Massachusetts, in violation of Section 5B(a)(1) of the Massachusetts FCA.

130.    By virtue of the false or fraudulent claims presented or caused to be presented by Defendants, Massachusetts suffered and is entitled to recover treble damages and a civil penalty for each false claim.

### COUNT IV
### MASSACHUSETTS WHISTLEBLOWER LAW: THE FALSE CLAIMS ACT, MASS. GEN. LAWS ANN. CH. 12 §§ 5B(a)(2)

131.    Relator incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

132.    Defendants made, used, and caused to be made or used, false records or statements material to a false or fraudulent claim to Massachusetts, in violation of Section 5B(a)(2) of the Massachusetts FCA.

133.     By virtue of the false or fraudulent claims presented or caused to be presented by Defendants, Massachusetts suffered and is entitled to recover treble damages and a civil penalty for each false claim.

## REQUESTS FOR RELIEF

WHEREFORE, Relator, on behalf of the United States and the Commonwealth of Massachusetts, demands that judgment be entered in his favor and against Defendants for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count.

This includes, with respect to the Federal False Claims Act, three times the amount of damages to the Federal Government plus civil penalties for each false claim, and any other recoveries or relief provided for under the Federal False Claims Act.

This Request also includes, with respect to the Massachusetts False Claims Act, the maximum damages permitted and the maximum fine or penalty permitted by that Statute, and any other recoveries or relief provided for under the law.

Further, Relator requests that he receive the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States and Massachusetts, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs.  Relator requests that his award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action.

## DEMAND FOR JURY TRIAL

A jury trial is demanded in this case.

Dated: January 19, 2024                    Respectfully submitted,


                                           s/Jonathan Shapiro
                                           Jonathan Shapiro
                                           BBO No. 454220
                                           Shapiro & Teitelbaum LLP
                                           55 Union Street, 4th Floor
                                           Boston, MA 02108
                                           Telephone: 617-742-5800
                                           jshapiro@jsmtlegal.com

                                           Berger Montague, PC
                                           Sherrie R. Savett, Esq. (admitted *pro hac vice*)
                                           Joy Clairmont, Esq. (admitted *pro hac vice*)
                                           1818 Market St, Ste 3600
                                           Philadelphia, PA 19103
                                           jclairmont@bm.net

                                           *Counsel for Plaintiff-Relator*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that the foregoing document, filed through the ECF system, has been served electronically on the registered participants identified on the Notice of Filing on January 19, 2024.

s/Jonathan Shapiro
Jonathan Shapiro